DANNER, J.
*1107 A jury convicted appellant Christopher Weaver of making criminal threats and exhibiting a deadly weapon. The trial court sentenced Weaver to four years in prison. On appeal, Weaver claims that the trial court erred by failing to hold a hearing on a Marsden[1] motion and by admitting evidence of a prior uncharged battery under Evidence Code section 1101, subdivision (b). In supplemental briefing, Weaver contends that recently enacted Penal Code section 1001.36, allowing for pretrial mental health diversion, retroactively applies to him, and that his case should be remanded to the trial court for a hearing on his diversion eligibility.
*225 For the reasons explained below, we conditionally reverse the judgment and remand the matter to the trial court for a hearing under Penal Code section 1001.36 to determine whether to grant Weaver mental health diversion. We reject Weaver's remaining claims.
I. FACTS AND PROCEDURAL BACKGROUND
A. Procedural Background
In April 2017, the Santa Cruz County District Attorney filed an information charging Weaver with two counts of making criminal threats ( Pen. Code, § 422 ; counts 1 & 2),[2] and misdemeanor exhibition of a deadly weapon *1108 (§ 417, subd. (a)(1); count 3). The information further alleged as to count 2 that Weaver personally used a deadly or dangerous weapon while committing the charged offense (§ 12022, subd. (b)(1)), and as to counts 1 and 2 that Weaver had suffered one prior serious felony conviction for violating section 459 (§ 667, subd. (a)(1)), one prior strike conviction (§ 667, subds. (b)-(i)), and six prior convictions resulting in prison terms (§ 667.5, subd. (b)).
Weaver's prosecution began with the filing of a felony complaint in June 2016. An attorney from the public defender's office, Jon Minsloff, represented Weaver at his arraignment on the complaint. At the next court appearance on July 15, 2016, Nicola Whitehead, an attorney from a law firm that had been representing Weaver on other pending cases, appeared and requested that her firm also be appointed on this case. The trial court granted the request, relieved the public defender, and appointed the "Page firm" to represent Weaver. At the July 15 court appearance, Whitehead declared a doubt about Weaver's mental competence. The trial court suspended the proceedings pursuant to section 1368 and ordered an evaluation of Weaver by Dr. Thomas Reidy. Dr. Reidy evaluated Weaver, diagnosed him as suffering from schizophrenia, and concluded that he was not competent to stand trial. Dr. Reidy explained that Weaver "demonstrates impairment to such a degree that he cannot rationally participate in the court proceedings, and in particular, cannot rationally and consistently communicate with his attorney due to prominent and acute mental health symptoms."
At the next court appearance on August 2, 2016, the trial court found Weaver incompetent to stand trial based on Dr. Reidy's evaluation and ordered that the proceedings remain suspended. On August 16, 2016, the trial court ordered Weaver transferred to Atascadero State Hospital (Atascadero) until his restoration to competency.
At a later court appearance, the trial court appointed a second expert, Dr. Gregory Katz, to evaluate Weaver's competence. The trial court subsequently considered Dr. Katz's report-which concurred with Dr. Reidy's opinion concerning Weaver's incompetence-and continued to hold the proceedings suspended, pending Weaver's transportation to Atascadero for restoration of competency. Weaver was transported to Atascadero. While Weaver was at Atascadero, doctors there diagnosed him with schizoaffective disorder in partial remission.
Approximately two and a half months later, Weaver was transported back from Atascadero to Santa Cruz County. On January 19, 2017, Weaver appeared in court with new defense counsel from the Page law firm, Mitchell *1109 Page.[3] Based on a certification *226 of mental competency and a doctor's report from Atascadero, the trial court found Weaver competent and resumed the proceedings. At defense counsel's request, the court directed the county's mental health department to explore possible programs to which Weaver could be released pending trial.
On January 24, 2017, the trial court ordered that Weaver be released to a residential mental health treatment facility pending trial. As a condition of his release, Weaver agreed to such placement and to continue taking medications as prescribed.
On March 10, 2017, the trial court revoked Weaver's release after Weaver was discharged from a mental health program because he failed to follow the directions of the program's staff. Nevertheless, the trial court ordered the county's mental health department to find a new placement for Weaver. Thereafter, Weaver was released to another mental health program. On April 10, 2017, the trial court conducted a preliminary hearing, held Weaver to answer, revoked Weaver's release to the mental health program, and remanded Weaver into custody. The trial court noted that Weaver had been "released at least twice to programs and they're not working."
On June 6, 2017, the trial court granted the district attorney's motion to dismiss the prior strike and prior serious felony conviction allegations. The parties subsequently explained that the information charged only three prior prison terms.
In October 2017, a jury heard evidence and found Weaver guilty of counts 1, 2, and 3. The jury further found true the deadly weapon allegation in count 2. Weaver subsequently waived his right to trial on the remaining allegations and admitted the three prison prior allegations.
On November 28, 2017, the trial court sentenced Weaver to a total term of four years and eight months in prison and imposed various fines and fees. The trial court later corrected a sentencing error and reduced the total prison term to four years.
*1110 B. The Evidence Presented at Trial
1. The Prosecution Evidence
In June 2016, Weaver was homeless. Paige C.[4] volunteered at a soup kitchen for the homeless in Santa Cruz. On June 6, Weaver visited the soup kitchen and "started yelling and screaming" in the soup kitchen's courtyard. Paige approached Weaver and asked him what was wrong. Weaver demanded to use the soup kitchen's shower. Paige explained to Weaver the scheduling rules for the shower. Weaver got within inches of Paige's face, called her a racist bitch, and spat in her face. Weaver left the soup kitchen after Paige threatened to call the police. The encounter lasted "about five or six minutes."
On June 13, 2016, Weaver returned to the soup kitchen around 12:55 p.m., "again yelling, screaming, carrying on, and telling everybody he's going to take a shower no matter what [any staff member] said." Paige explained to Weaver that he was too late to sign up for and use the shower. Weaver got within inches of Paige's face and spat on her, insisting that "he was *227 going to take a shower." When Paige reiterated that Weaver could not use the shower, he "raised his fists at [her] and said, 'When I see you again, I'm going to kill you.' " Weaver specifically threatened to "slice [her] up" and "slice [her] open." He also called Paige "a racist bitch." He said, " 'You're a cunt,' and 'You're just a racist white woman, and you're just out for a black man....' " Other homeless persons told Weaver to leave, which he did about 15 minutes after he had arrived. Paige took Weaver's threats to kill her "literally" and "seriously," and she was "[t]errified." The June 13 incident with Paige formed the basis of the criminal threats charge in count 1.
On the evening of June 16, 2016, Paige and her husband, Damon B., went out for ice cream in downtown Santa Cruz. While eating outside the ice cream shop, they heard a person yelling, cussing, and "creating a scene" in the distance. Paige recognized the voice as Weaver's and told Damon that the yelling man was the one who had threatened to kill her. Weaver then walked by Paige and Damon; he appeared "angry, mad at the world." Weaver looked at Paige, continued walking for a short distance, then "thr[ew] his stuff down, turn[ed] around and c[ame] after" her and Damon. Damon got in between Paige and Weaver. As Weaver approached, he "start[ed] screaming about [them] being racist, and he said that he was going to slice [Damon] and he would do the same to [Paige]." Weaver said, " 'I'll slice you, and I'll slice your white woman.' " About two or three minutes into the confrontation, Weaver pulled out a folded pocketknife, held it next to Damon's cheek, and *1111 said he would cut Damon like he would cut Paige. Weaver's threats caused Damon to fear for his and Paige's safety. The June 16 incident with Damon formed the basis of the criminal threats charge in count 2.
Paige called 911 during the confrontation on June 16. Santa Cruz Police Officer Caitlin McBride responded to the call with a fellow officer. The police found a folding knife with a three-inch blade in Weaver's pocket. Weaver was "yelling and cussing" during the interaction with police. Officer McBride believed that Weaver was likely under the influence of a stimulant.
Richard S. testified about an uncharged encounter he had with Weaver at a 7-Eleven store in Santa Cruz on March 28, 2016.[5] As Richard was getting into his car outside the store, he heard a loud commotion inside. When Richard looked into the store, he saw a person at the counter (later identified as Weaver) yelling at the store clerk. Richard walked back into the store and heard the man yelling at the clerk, "You're a racist." Richard noticed that the man had a long hunting knife "in a sheath on his side." Richard yelled out that the man had a knife and warned him not to "pull that knife." The man asked Richard what he was going to do about it. The man moved toward Richard in a "challenging manner," and Richard tried to get him out of the store. Richard told the clerk to call the police and put up his hands to prevent the man from moving toward the clerk. The man then struck Richard twice in the head. Richard asked the man, "Do you realize what you've done?" The man got in Richard's face, yelled, and spat on him.
2. The Defense Evidence
Weaver was the sole defense witness, and the defense did not offer any evidence other than his testimony. Weaver testified *228 that he had difficulty speaking clearly because he had been struck by an automobile in 2004 and suffered extensive injuries to his face. He also testified about the circumstances of his homelessness.
Weaver had many times visited the soup kitchen for showers and meals. He had seen Paige there before the incidents in June 2016, but he had not interacted with her previously. Weaver admitted that he unsuccessfully tried to get a shower on June 6 and June 13. On June 13, Weaver put his name on the shower list but left the shower line to console a distraught friend. When Weaver returned to the shower line, a volunteer told him he had been gone for half an hour and could not shower that day. Weaver insisted that he was not absent for that long and was going to take a shower. The volunteer then *1112 told Paige that Weaver was not following directions and could not use the shower. After Paige supported the volunteer's decision, Weaver "called her a bitch and told her she was wrong for not letting [him] take a shower." Weaver "[did] not recall" whether he said the things that Paige testified to; Weaver "was upset at the time" of the incident.
Weaver testified further that when he walked by Paige and Damon on June 16, he heard Paige say, " 'There goes that nigger that threatened me at work the other day.' " Weaver "turned around and ... looked" at the couple, who then "started, 'We're calling the cops.' " Weaver testified that he did not "recall saying the things" that Damon reported. Weaver was still upset on June 16 that he had not gotten a shower on June 13.
Weaver recalled the 7-Eleven incident. He testified that the store clerk working that day had refused to give him water for free, even though other clerks at that store had done so previously. Weaver denied that he had yelled at or threatened the clerk, but Weaver acknowledged that he was upset, complained about the charge for water, and felt he was treated unfairly. Weaver recalled that Richard had said, " 'He's got a knife. Call the police.' " Weaver did not recall speaking to Richard in the manner to which he testified. Weaver said he "was upset, but [he] wasn't upset to call any racial names, or anything like that, you know." Weaver "didn't mean for any of the things that [he] said to be taken seriously." He was "just upset and ... unmedicated," and when he is unmedicated, he has "a problem communicating[,] a problem problem solving, and ... a problem ... being grounded."
On cross-examination, Weaver testified that he felt he had been targeted when he was not permitted to shower while others were. Weaver acknowledged that he had yelled at Paige on June 6 because he was upset about not getting a shower, but he denied spitting on her. Weaver also testified that he had lost his place in the shower line while consoling his friend on June 6, rather than on June 13. Weaver then said that he had only one interaction with Paige at the soup kitchen-not two-and he could not remember whether the interaction was on June 6 or June 13. During their interaction, Weaver had called Paige a "bitch," but he did not "recall calling her a racist" and he did not intentionally spit on her. Weaver admitted that he "may have ... cursed [Paige] out [and] even called her a racist bitch, but [he] never recall [sic ] saying, 'I'm going to kill you. I'm going to pull out your guts and let people laugh.' " Weaver also denied threatening Paige's life.
Regarding the June 16 confrontation, Weaver added that he said, " 'Screw you' " to Paige and said to her "verbatim," " 'Keep your "niggers" to yourself.' " Weaver did not recall whether he called Paige a racist bitch *1113 during this incident. Weaver admitted that he had removed a *229 knife from his pocket, but he denied placing the knife next to Damon's face or threatening to kill him.
Weaver did not remember calling the clerk at the 7-Eleven a racist. Weaver testified that he had said, "Screw you," to Richard, who then grabbed Weaver. In turn, Weaver struck Richard. Weaver testified that, although he was upset at the time of this incident, he recalled having said to Richard, "You touch me again, I'm going to knock you out," and "Call [the police]. I don't care. You think every nigger is going to run every time you call the cops."
II. DISCUSSION
Weaver raises three claims on appeal. First, he contends that a letter he filed with the trial court requested replacement of his defense counsel under Marsden , and the trial court committed prejudicial error when it failed to hold a hearing on that request. Second, Weaver claims that the trial court erred when it admitted evidence under Evidence Code section 1101, subdivision (b), of the uncharged incident involving Richard S. Finally, Weaver contends that section 1001.36 applies to him retroactively, and we should remand his case to the trial court for a hearing to determine his eligibility for pretrial mental health diversion.
A.-B.**
C. Mental Health Diversion Under Section 1001.36
In a supplemental opening brief, Weaver claims that we should conditionally reverse the judgment and remand this matter for a hearing to determine his eligibility for pretrial mental health diversion under section 1001.36.[10] Weaver argues that People v. Frahs (2018) 27 Cal.App.5th 784, 238 Cal.Rptr.3d 483 ( Frahs ), review granted on December 27, 2018, S252220, controls this case. In Frahs , the Fourth District Court of Appeal, Division Three, concluded that section 1001.36 applies retroactively to cases not yet *1114 final on appeal. ( Frahs , supra , at p. 791, 238 Cal.Rptr.3d 483.) The Frahs court remanded the case to the superior court with directions to conduct a diversion eligibility hearing, because the record disclosed that appellant apparently met at least one of the threshold requirements under section 1001.36 (i.e., a diagnosed mental disorder). ( Frahs , supra , at p. 791, 238 Cal.Rptr.3d 483.)[11]
The Attorney General raises several arguments in opposition to Weaver's claim. The arguments include that the language of section 1001.36 reveals it was not intended to apply retroactively, the legislative history supports prospective application, the reasoning of the court in Frahs is not compelling, and, even if section 1001.36 were to be applied retroactively, it is not appropriate to remand whenever there is *230 proof in the record of simply one of the six statutory preconditions for diversion.[12]
After completion of supplemental briefing, the Fifth District Court of Appeal decided People v. Craine (2019) 35 Cal.App.5th 744, 247 Cal.Rptr.3d 564 ( Craine ). The court in Craine held that " section 1001.36 does not apply retroactively to defendants whose cases have progressed beyond trial, adjudication of guilt, and sentencing." ( Id. at p. 760, 247 Cal.Rptr.3d 564.) The court recognized, in accord with Frahs , that section 1001.36 "confers a potentially ameliorative benefit to a specified class of persons." ( Craine , supra , at p. 754, 247 Cal.Rptr.3d 564.) However, contrary to Frahs , the court in Craine concluded "the text of section 1001.36 and its legislative history contraindicate a retroactive intent with regard to defendants ... who have already been found guilty of the crimes for which they were charged." ( Id. at p. 749, 247 Cal.Rptr.3d 564.)
1. Statutory Overview
Section 1001.36 creates a "pretrial diversion" program for certain defendants who suffer from a diagnosed and qualifying mental disorder. ( § 1001.36, subd. (b)(1)(A).)The stated purpose of the statute "is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings.
*1115 [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35.)
Under the statutory scheme, a trial court may "grant pretrial diversion to a defendant pursuant to this section if the defendant meets all of the requirements specified in paragraph (1) of subdivision (b)." ( § 1001.36, subd. (a).) The statute includes six requirements that the trial court must find before granting diversion.[13] "At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion.... If a prima facie showing is not made, the court may summarily deny the *231 request for diversion or grant any other relief as may be deemed appropriate." ( § 1001.36, subd. (b)(3).)
The statute defines " 'pretrial diversion' " as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment," subject to multiple restrictions. ( § 1001.36, subd. (c).)
If a defendant meets the six requirements in paragraph (1) of subdivision (b), the trial court may order pretrial diversion into an approved mental health treatment program for a maximum period of two years. ( § 1001.36, subd. (c)(1), (c)(3).) If the defendant commits additional crimes or otherwise performs unsatisfactorily in the diversion program, the trial court may reinstate the criminal proceedings. ( § 1001.36, subd. (d).) "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." ( § 1001.36, subd. (e).) The statute further provides that "the arrest upon which the diversion was based shall be deemed never to have occurred" ( § 1001.36, subd. (e) ) and imposes certain limitations on access to related records when diversion is successfully completed. ( § 1001.36,subd. (f).)
*1116 2. Legal Principles Regarding Retroactivity
Penal statutes are generally presumed to apply prospectively unless they expressly state otherwise. (See Tapia v. Superior Court (1991) 53 Cal.3d 282, 287, 279 Cal.Rptr. 592, 807 P.2d 434 ; § 3.) However, under In re Estrada (1965) 63 Cal.2d 740, 48 Cal.Rptr. 172, 408 P.2d 948, "an amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date." ( People v. Floyd (2003) 31 Cal.4th 179, 184, 1 Cal.Rptr.3d 885, 72 P.3d 820 ( Floyd ), citing Estrada , at p. 744, 48 Cal.Rptr. 172, 408 P.2d 948 ; see also In re Kirk (1965) 63 Cal.2d 761, 762-763, 48 Cal.Rptr. 186, 408 P.2d 962.)
"Because the Estrada rule reflects a presumption about legislative intent, rather than a constitutional command, the Legislature ... may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if it so chooses." ( People v. Conley (2016) 63 Cal.4th 646, 656, 203 Cal.Rptr.3d 622, 373 P.3d 435 ( Conley ); see also People v. Dehoyos (2018) 4 Cal.5th 594, 601, 229 Cal.Rptr.3d 687, 412 P.3d 368 ( Dehoyos ).) Although "express statements unquestionably suffice to override the Estrada presumption, the 'absence of an express saving clause ... does not end "our quest for legislative intent." ' "[14] ( Conley , at p. 656, 203 Cal.Rptr.3d 622, 373 P.3d 435.)
Case law "do[es] not 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an *232 ameliorative change; rather, they require 'that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' " ( Conley , supra , 63 Cal.4th at pp. 656-657, 203 Cal.Rptr.3d 622, 373 P.3d 435.)Stated differently, "[t]he Estrada rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " ( People v. Buycks (2018) 5 Cal.5th 857, 881, 236 Cal.Rptr.3d 84, 422 P.3d 531 ( Buycks ).)
Regarding the scope of the Estrada inference, recently in *1117 People v. Superior Court (Lara ) (2018) 4 Cal.5th 299, 228 Cal.Rptr.3d 394, 410 P.3d 22, the California Supreme Court decided "whether [the] requirement of a transfer hearing before a juvenile can be tried as an adult applie[d] to [a] defendant even though he had already been charged in adult court before Proposition 57 took effect." ( Id. at p. 306, 228 Cal.Rptr.3d 394, 410 P.3d 22.) The court held that "the same inference of retroactivity" under Estrada applies to a statutory amendment that merely "ameliorated the possible punishment for a class of persons." ( Id. at p. 308, 228 Cal.Rptr.3d 394, 410 P.3d 22.) The court further concluded that "[n]othing in Proposition 57 itself or the ballot materials rebuts this inference.... They are inconclusive." ( Id. at p. 309, 228 Cal.Rptr.3d 394, 410 P.3d 22.)
3. Analysis
There is no dispute here that section 1001.36 confers a potentially ameliorative benefit to a specified class of persons, i.e., defendants with certain diagnosed mental disorders.[15] We agree with the parties regarding the potential benefit of section 1001.36. ( Frahs , supra , 27 Cal.App.5th at p. 791, 238 Cal.Rptr.3d 483 ; Craine , supra , 35 Cal.App.5th at p. 754, 247 Cal.Rptr.3d 564.) Thus, the question before us is whether the Legislature " ' "clearly signal[ed] its intent" ' " to overcome the Estrada presumption that section 1001.36 will apply to individuals who were convicted and sentenced before the section took effect but whose cases, like Weaver's, are not yet final on appeal. (See People v. Lara (2019) 6 Cal.5th 1128, 1134, 245 Cal.Rptr.3d 426, 438 P.3d 251 ( Lara ).)
Weaver urges us to adopt the conclusion of the court in Frahs and hold that the pretrial diversion scheme set out in section 1001.36 applies to him, even though he has already been convicted following a jury trial and sentenced to prison. The Attorney General contends that the statute's definition of " 'pretrial diversion' " as the "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication" ( § 1001.36, subd. (c) ) "rebuts ' Estrada 's inference of retroactivity.' "
The California Supreme Court has recently decided a number of cases analyzing Estrada , and the court has made clear that the burden to overcome the Estrada inference is substantial. For example, in Lara , supra , 6 Cal.5th 1128, 245 Cal.Rptr.3d 426, 438 P.3d 251, the Supreme Court reiterated that "under Estrada , ' "[a]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's *233 effective date" [citation], unless the enacting body "clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its *1118 equivalent." ' " ( Id. at p. 1134, 245 Cal.Rptr.3d 426, 438 P.3d 251 citing DeHoyos , supra , 4 Cal.5th at p. 600, 229 Cal.Rptr.3d 687, 412 P.3d 368 and People v. Nasalga (1996) 12 Cal.4th 784, 791-794, 50 Cal.Rptr.2d 88, 910 P.2d 1380.)
The California Supreme Court's decisions in Dehoyos and Lara highlight the strength of the Estrada inference and the demanding standard required to overcome its presumption. In DeHoyos , the court "employed [the Estrada ] framework to determine whether Proposition 47's amended penalty provisions apply automatically-that is, without need for a resentencing petition under section 1170.18-to defendants who were serving felony sentences as of Proposition 47's effective date but whose sentences had not yet become final on appeal." ( Lara , supra , 6 Cal.5th at p. 1134, 245 Cal.Rptr.3d 426, 438 P.3d 251.)The Supreme Court concluded that the detailed petition process set out in Proposition 47 demonstrated that the electorate intended that convicted persons use the petition process to secure Proposition 47 relief, rather than intending that Proposition 47 apply directly to them.
The court observed that, although "Proposition 47 contains no express savings clause[,] [i]t does ... address the question of retrospective application in conspicuous detail." ( Dehoyos , supra , 4 Cal.5th at p. 601, 229 Cal.Rptr.3d 687, 412 P.3d 368.) The court explained that the proposition contains "[s]eparate provisions [that] articulate the conditions under which the new misdemeanor penalty provisions apply to completed sentences [citation], sentences still being served [citation], and sentences yet to be imposed." ( Ibid. ) Thus, "Proposition 47 ... is 'not silent on the question of retroactivity,' [ (as was the case in Estrada ) ] but instead contains a detailed set of provisions designed to extend the statute's benefits retroactively." ( Id. at p. 603, 229 Cal.Rptr.3d 687, 412 P.3d 368.) The court further said that its "holding here, like [its] conclusion in Conley , depends on a conclusion about the intended operation of a statutory scheme that provides a particular mechanism for the retroactive application of the ameliorative changes the measures brought about; it does not depend on the relative scope or scale of those changes."[16] ( Dehoyos , supra , at p. 605, 229 Cal.Rptr.3d 687, 412 P.3d 368.)
The California Supreme Court reached a different conclusion in a Proposition 47 case examining application of the initiative to defendants who had not yet been sentenced when Proposition 47 went into effect. In Lara , the court explained that Proposition 47 "does not expressly address reduction of punishment for a defendant who had not yet been sentenced on its effective date. On the contrary, Proposition 47's resentencing provisions are simply *1119 silent on the subject of retroactivity as to such a defendant." ( Lara , supra , 6 Cal.5th at p. 1135, 245 Cal.Rptr.3d 426, 438 P.3d 251.) The court concluded, "In the absence of contrary indications, we may therefore presume under Estrada that the enacting body intended Proposition 47's reduced penalties to apply in this category of nonfinal *234 cases. [¶] We therefore agree with the parties that the applicable ameliorative provisions of Proposition 47 (here, Pen. Code,§ 490.2 ) apply directly in trial and sentencing proceedings held after the measure's effective date, regardless of whether the alleged offense occurred before or after that date." ( Ibid. )
Although the California Supreme Court's cases do not " 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an ameliorative change" ( Conley , supra , 63 Cal.4th at p. 656, 203 Cal.Rptr.3d 622, 373 P.3d 435 ), recent decisions make clear that the standard of "sufficient clarity" to overcome the Estrada presumption imposes a heavy burden. The only statutes the Supreme Court have recently found sufficiently clear to overcome the Estrada presumption are those containing an explicit statement to that effect (absent, for example in Lara , and present in Floyd ) or creating an alternative mechanism, such as a petition requirement, that individuals who have already been convicted must satisfy (as in Dehoyos ).
Typically, "[w]hen we interpret statutes, our primary task is to determine and give effect to the Legislature's purpose in enacting the law. [Citations.] We first look to the words of the statute, as they are generally the most reliable indicators of the legislation's purpose. [Citations.] To further our understanding of the intended legislative purpose, we consider the ordinary meaning of the relevant terms, related provisions, terms used in other parts of the statute, and the structure of the statutory scheme." ( In re H. W. (2019) 6 Cal.5th 1068, 1073, 245 Cal.Rptr.3d 51, 436 P.3d 941.)
However, Estrada employs a different lens on legislative intent. The rule "supports an important, contextually specific qualification to the ordinary presumption that statutes operate prospectively: When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date. [Citation.] We based this conclusion on the premise that ' "[a] legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law." ' [Citation.] ' "Nothing is to be gained," ' we reasoned, ' "by imposing the more severe penalty after such a pronouncement ... other than to satisfy a desire for vengeance" ' [citation]-a motive we were unwilling to attribute to the Legislature." ( *1120 People v. Brown (2012) 54 Cal.4th 314, 323, 142 Cal.Rptr.3d 824, 278 P.3d 1182, footnote and italics omitted.) This reasoning underlies the demanding standard reflected in the California Supreme Court's recent cases examining the Estrada presumption.
We recognize that application of section 1001.36 to individuals who have already been convicted but whose convictions are not yet final on appeal may appear to conflict with several aspects of the provision's text. In particular, the statute's definition of "pretrial diversion" states that diversion is available only "until adjudication." ( § 1001.36, subd. (c).) As the Craine court observed, "adjudication" is a "shorthand for the adjudication of guilt or acquittal" ( Craine , supra , 35 Cal.App.5th at p. 755, 247 Cal.Rptr.3d 564 ) and "[a]t most ... could be synonymous with the rendition or pronouncement of judgment, which occurs at the time of sentencing." ( Ibid. ) When a case is remanded to the trial court for potential diversion after the defendant *235 has been sentenced, the term " 'until adjudication' " is rendered surplusage. ( Ibid. ) Further, as the Craine court explained, "pretrial diversion is literally and functionally impossible once a defendant has been tried, found guilty, and sentenced. Upon reaching this point of 'adjudication,' the 'prosecution' is over and there is nothing left to postpone. ( § 1001.36, subd. (c).)" ( Id. at p. 756, 247 Cal.Rptr.3d 564.)
In addition, the statute requires that the defendant consent to diversion and "waive[ ] his or her right to a speedy trial ...." ( § 1001.36, subd. (b)(1)(D).) A defendant who has been tried and sentenced no longer has a speedy trial right to waive. (See Betterman v. Montana (2016) --- U.S. ----, 136 S.Ct. 1609, 1618, 194 L.Ed.2d 723 [2016 U.S. Lexis 3349] ; People v. Domenzain (1984) 161 Cal.App.3d 619, 622, 207 Cal.Rptr. 724.) Furthermore, as the court in Craine observed, the provision addressing the dismissal of charges and the limits on access to records after satisfactory completion of diversion (namely subdivision (e)) uses "preadjudicative language to describe these benefits." ( Craine , supra , 35 Cal.App.5th at p. 757, 247 Cal.Rptr.3d 564.)
However, contrary to the reading of this language by the court in Craine , we view these portions of the statute as demonstrating the Legislature's intent that individuals who commit their crimes after the effective date of section 1001.36 and whose guilt has been adjudicated in the form of a plea of guilty or no contest or a conviction after trial are no longer eligible for pretrial diversion under the statute. But for individuals like Weaver, whose convictions are not yet final on appeal but were never given an opportunity for diversion because they were convicted prior to the statute's effective date, we see nothing in the text of section 1001.36 sufficient to overcome the Estrada presumption.
For example, the Legislature did not include in section 1001.36 an "express savings clause" mandating prospective application. In addition, we *1121 conclude that the statute's creation of a pretrial mental health diversion scheme does not " ' "clearly signal[ ]" ' " the Legislature's intent to bar retroactive application. (See Lara , supra , 6 Cal.5th at p. 1134, 245 Cal.Rptr.3d 426, 438 P.3d 251.)
Unlike Proposition 47-which by its terms "address[ed] the question of retrospective application [to defendants who had already been sentenced] in conspicuous detail" ( Dehoyos , supra , 4 Cal.5th at p. 601, 229 Cal.Rptr.3d 687, 412 P.3d 368 )- section 1001.36 is not clear regarding its application to cases not yet final on appeal at the time of its enactment. The statute does not "contain any language indicating that it otherwise limits or subsumes the ordinary presumption long established under the Estrada rule."[17] ( *236 Buycks , supra , 5 Cal.5th at pp. 882-883, 236 Cal.Rptr.3d 84, 422 P.3d 531.) Given the legislative clarity demanded by recent cases examining Estrada and retroactivity, statutory ambiguity does not suffice to overcome the Estrada presumption. Accordingly, we cannot conclude that the Legislature has " ' "clearly signal[ed] its intent" ' " ( Lara , supra , 6 Cal.5th at p. 1134, 245 Cal.Rptr.3d 426, 438 P.3d 251 ) that section 1001.36 apply only prospectively, and the Estrada inference of retroactivity therefore is not rebutted.
Having concluded that section 1001.36 applies retroactively to Weaver, we must decide whether this case should be remanded to the trial court for a determination regarding Weaver's eligibility for mental health diversion. The Frahs court suggested that remand is appropriate when "the record affirmatively discloses that [the defendant] appears to meet at least one of the threshold requirements" of section 1001.36, subdivision (b)(1). ( Frahs , supra , 27 Cal.App.5th at p. 791, 238 Cal.Rptr.3d 483.)The record here affirmatively *1122 discloses that Weaver appears to meet at least one of the threshold requirements, namely, he suffers from a diagnosed mental health disorder. (See § 1001.36, subd. (b)(1)(A).)
In sum, we conclude that the Legislature did not " ' "clearly signal[ ] its intent" ' " to overcome the Estrada presumption that section 1001.36 will apply to individuals who, like Weaver, were convicted and sentenced before the statute's effective date but whose cases were not yet final on appeal. ( Lara , supra , 6 Cal.5th at p. 1134, 245 Cal.Rptr.3d 426, 438 P.3d 251.)
III. DISPOSITION
The judgment is conditionally reversed. The matter is remanded to the trial court with directions to hold a hearing under Penal Code section 1001.36 to determine whether to grant Weaver diversion under that statute. If the trial court grants diversion, it shall proceed in accordance with that statute. If Weaver performs satisfactorily in diversion, the trial court shall dismiss the charges. ( § 1001.36, subd. (e).) If the trial court does not grant diversion, or if it grants diversion but Weaver does not satisfactorily complete diversion ( § 1001.36, subd. (d) ), then the trial court shall reinstate the judgment.
WE CONCUR:
GREENWOOD, P.J.
BAMATTRE-MANOUKIAN, J.

People v. Marsden (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (Marsden ).

Unspecified statutory references are to the Penal Code.

Page remained Weaver's counsel for the rest of the case. However, at six pretrial proceedings after Page took over the representation, different counsel appeared in Page's stead. Minsloff appeared with Weaver on one of those occasions. Nicola Whitehead never appeared with Weaver after Weaver was transported to Atascadero.

To protect the victims' privacy, we first refer to them by their first names and the first initial of their last names and, in the rest of the opinion, by their first names only. (Cal. Rules of Court, rule 8.90(b)(4).)

This incident was the subject of an in limine motion and admitted under Evidence Code section 1101, subdivision (b).

See footnote *, ante .

Section 1001.36 was passed by the Legislature as part of a health care budget bill-Assembly Bill No. 1810 (2017-2018 Reg. Sess.)-and took effect on June 27, 2018, during the pendency of Weaver's appeal. (Stats. 2018, ch. 34, §§ 24, 37.) Three months later, the statute was amended by Senate Bill No. 215 to, among other things, prohibit mental health diversion in cases involving certain crimes. (§ 1001.36, subd. (b)(2)(A)-(H) ; Stats. 2018, ch. 1005, § 1.) The amendment took effect on January 1, 2019. (See Cal. Const., art. IV, § 8, subd. (c)(1).) Weaver's crimes continue to be eligible for mental health diversion.

The questions before the California Supreme Court on review of Frahs are whether section 1001.36 applies retroactively to all cases in which the judgment is not yet final and whether the Court of Appeal erred by remanding for a determination under section 1001.36. (People v. Frahs (Dec. 27, 2018) 242 Cal.Rptr.3d 417 (Mem).)

The Attorney General requested that we take judicial notice of an Assembly Floor Analysis (as amended on June 12, 2018) of Assembly Bill No. 1810. Weaver did not file a response to the request. Rather, he argued in his supplemental briefing that "neither the statute's language nor the legislative history contradict the Legislature's stated purpose in passing Assembly Bill 1810." Accordingly, we grant the Attorney General's request for judicial notice. (Evid. Code, §§ 452, 459 ; Cal. Rules of Court, rule 8.252.)

First, the trial court must be "satisfied that the defendant suffers from a mental disorder" as described in the statute, and the evidence provided "shall include a recent diagnosis by a qualified mental health expert." (§ 1001.36, subd. (b)(1)(A).) Second, the court must also be satisfied that "the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) Third, "a qualified mental health expert" must opine that "defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) Fourth, subject to certain exceptions related to incompetence, the defendant must consent to diversion and waive his or her right to a speedy trial. (§ 1001.36, subd. (b)(1)(D).) Fifth, the defendant must agree to "comply with treatment as a condition of diversion." (§ 1001.36, subd. (b)(1)(E).) And finally, the court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety ... if treated in the community." (§ 1001.36, subd. (b)(1)(F).)

An example of an express saving clause can be found in Proposition 36, the Substance Abuse and Crime Prevention Act of 2000. The California Supreme Court in Floyd "conclude[d] that the act's saving clause-which states that '[e]xcept as otherwise provided, the provisions of this act shall become effective July 1, 2001, and its provisions shall be applied prospectively' [citation]-indicates the act was not intended to apply retroactively" to cases not yet final as of the act's effective date. (Floyd , supra , 31 Cal.4th at p. 182, 1 Cal.Rptr.3d 885, 72 P.3d 820.)

The Attorney General concedes that "section 1001.36 has a potentially ameliorative effect," but he argues that section 1001.36 contains "direct language indicating pretrial mental health diversion is not to be available retroactively."

Similarly, in People v. Yearwood (2013) 213 Cal.App.4th 161, 151 Cal.Rptr.3d 901, the Court of Appeal concluded that section 1170.126's recall petition requirement (enacted by Proposition 36) was "the functional equivalent of a saving clause," unambiguous, and demonstrated voter intent that "a petition for recall of sentence to be the sole remedy available" for defendants seeking retroactive application. (Yearwood , supra , at p. 172, 151 Cal.Rptr.3d 901.)

We also note that the legislative history of the original section 1001.36-as passed in Assembly Bill No. 1810-shows that the text of the final bill was significantly broader than its original version. The drafters did not import certain limitations concerning the scope of the program that existed in pending Senate Bill No. 215, which appears to be a forerunner of the original section 1001.36. Specifically, when Assembly Bill No. 1810 passed in June 2018, the mental health diversion program then proposed in pending Senate Bill No. 215 (as section 1001.82) required the consent of the prosecution before diversion could be ordered if certain crimes were charged, including "any felony" (with the exception of certain Health and Safety Code and Vehicle Code offenses), "any offense involving the unlawful use or unlawful possession of a firearm," a "violation of section 192 or 192.5," an "offense for which a person, if convicted, would be required to register pursuant to Section 290, except for a violation of Section 314," a "violation of Section 273a, 273.5, 368, 597, or 646.9," an "offense resulting in damages of more than five thousand dollars ($5,000)," and an "offense that occurs within 10 years of three separate referrals to diversion pursuant to this section." (Assembly Amend. to Sen. Bill No. 215 (2017-2018 Reg. Sess.) June 14, 2018, < http://leginfo.legislature.ca.gov/faces/billVersionsCompareClient.xhtml?bill_id=201720180SB215& cversion=20170SB21594AMD> (as of Jun. 28, 2019), archived at: < https://perma.cc/4BYN-8XSE>.) This prosecutorial-consent requirement and these statutory exceptions to diversion were not included in the final version of the statute contained in Assembly Bill No. 1810. (Stats. 2018, ch. 34, § 24.)