Filed 10/23/20  P. v. Love CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090411 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE003414) |
| v. | |
| JOHNNY LOVE, | |
| Defendant and Appellant. | |

After a jury found defendant Johnny Love guilty of making criminal threats and assault with a deadly weapon, and found true prior serious felony convictions, the trial court sentenced him to an aggregate term of 13 years in state prison.  On appeal, defendant contends:  (1) the trial court prejudicially erred in instructing the jury with CALCRIM No. 875, that a box cutter could be an inherently deadly weapon; (2) trial counsel rendered ineffective assistance by failing to pursue pretrial mental health diversion, and we should remand for a determination of defendant's eligibility for mental

1

health diversion; and (3) the trial court violated defendant's due process rights by imposing various costs.

The People argue the trial court's error in instructing the jury with CALCRIM No. 875 was harmless and disagree with defendant's other two contentions.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 24, 2019, Shelly Gusman was working as a transit agent for Sacramento Regional Transit, conducting fare enforcement on light rail trains.

As Gusman boarded the rear car of a two-car train, she saw someone run out of the rear car and onto the front car. Gusman thought the person was "probably a fare evader," whom she would "meet[ ] up with [ ] at some point when" she switched train cars.

A little later, Gusman boarded the front car, announcing "tickets or passes" as she entered. Defendant "jump[ed] up" and exited the car. Gusman "thought he was going to . . . leave," but he didn't. Instead, the man "tr[ied] to board" the rear car that Gusman had just left. "So [Gusman] poked [her] head out" of the train and said to defendant, "Don't get on the train."

Defendant "turned around and threw his bags on the ground and said, 'I'm tired of you mother F'ers.' " Defendant "pulled something from his band, his waist, and said . . . 'I'm about to stab you, bitch' and came charging at" Gusman.

Defendant was "three to four feet" away from Gusman when the confrontation began, and held an object pointing forward in his right hand, his arm making a 90-degree angle. Gusman told defendant to "[s]tay back," but defendant moved "towards" her, and Gusman "backpedal[led]" onto the train.

Defendant continued moving towards Gusman, "climb[ed] up the stairs on the train," and threatened to stab Gusman at least one more time when he was again inside the train.

2

Gusman "backpedalled to the next door, hit the button so [she] could get out, and . . . took off running." Defendant followed Gusman out the door.[1]

Gusman "called it in" to the "security operations center" on her radio, saying she was "being chased by a guy with a knife," whom she recognized as defendant. Defendant said, "You know what, bitch, I'm gonna put a hit on you."

A responding law enforcement officer detained defendant as he was walking out of the train station where the confrontation occurred, and—about 10 feet "from where [the officer] detained" defendant—found the weapon that defendant brandished at Gusman:  a box cutter.

Defendant testified that when Gusman told him "don't get on that train," he "got alarmed," and "grabbed [his] box cutter," because he "kn[e]w" transit agents "have tasers."  Defendant "flick[ed]" the box cutter to ensure "it was fully open," held it "down" in his right hand, and "went onto the train to explain" to Gusman "where [he] was actually going and [his] reasons for . . . trying to get" there.  When defendant heard Gusman exclaim that he was holding a "knife," defendant's "only words to her were, 'this is not a knife, this is a box cutter.' "

On cross-examination, defendant admitted that, after Gusman told him not to board the train, he said to her, "I'm tired of you guys fucking bothering me."  But defendant denied ever threatening to stab Gusman.

---

[1] A transit officer who witnessed the incident testified that—after Gusman told defendant not to board the train—defendant "chased" Gusman back onto the train (i) while holding something in his hand, and (ii) holding his hand out in front of him, (iii) and threatened to "cut" Gusman "about three or four times."

A surveillance video of the incident was played for the jury and admitted into evidence. The video is not in the record on appeal.

He agreed that, when the confrontation began, he was "four to five feet" away from Gusman, and insisted that Gusman scared and "chased" him (by following him off the train) before he brandished the box cutter.

An August 5, 2019, an amended information charged defendant with criminal threats (Pen. Code, § 422; count one)[2] and assault with a deadly weapon (§ 245, subd. (a)(1); count two). The amended information also alleged defendant personally used a deadly and dangerous weapon during the commission of the crimes (§ 12022, subd. (b)(1)) and suffered prior serious felony convictions (§ 667, subds. (a), (b)-(i)).

After a trial that began on August 5, 2019, a jury found defendant guilty on both counts and found true the remaining allegations.

The trial court sentenced defendant to an aggregate term of 13 years, consisting of: assault with a deadly weapon, the upper term of four years in prison, doubled to eight years for a prior strike offense;[3] criminal threats, the upper term of three years in prison, doubled to six years for a prior strike offense, but stayed pursuant to section 654; a five-year enhancement for a prior serious felony conviction; and a one-year enhancement, stayed, for personally using a deadly weapon while making the criminal threats.

Regarding costs, defense counsel "ask[ed] the [c]ourt to strike all fines and fees due to [defendant's] indigent status." The trial court responded: "Well, some we have to impose, they're mandatory, and then if he's unable to pay, he's entitled to a hearing. The minimum, though."

Defendant timely appealed.

---

[2] Undesignated statutory references are to the Penal Code.

[3] The trial court granted the People's motion to dismiss one of the prior strike offenses found true by the jury.

**DISCUSSION**

**I**

Defendant argues trial counsel should have requested a hearing to determine defendant's "eligibility for mental health diversion" under section 1001.36. Counsel's failure to do so "denied [defendant] the effective assistance of counsel," defendant maintains.[4] Specifically, defendant contends that in light of (i) his "bizarre" behavior "on the day of the offense," (ii) "his trial testimony and his outbursts in court," (iii) his forced removal at sentencing, (iv) his statements to a probation officer regarding his mental illness, prescription drug use, and substance abuse; and (v) "the contents of the psychiatric evaluation prepared under Penal Code section 1368," he "should have been referred for mental health evaluation to determine his eligibility for mental health diversion."

The People argue trial counsel was not ineffective, because "there was little evidence that [defendant] suffered from a diagnosed mental health disorder that may qualify him for diversion," and "there was no reasonable probability that a different outcome would have occurred," even if trial counsel had pursued it.

We conclude defendant has not demonstrated ineffective assistance of trial counsel in this direct appeal,[5] as there is a satisfactory explanation for trial counsel's failure to seek diversion under section 1001.36.

---

[4] Defendant acknowledges that his mental health diversion claim may be forfeited otherwise.

[5] We note that "Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, ineffective assistance claims are normally raised in habeas corpus proceedings where such evidence can be presented." (*People v. Arce* (2014) 226 Cal.App.4th 924, 930.) To the extent defendant believes matters outside the record support such a claim, habeas corpus is the appropriate remedy to bring those matters to a court's attention.

*Additional background*

Enacted June 2018, section 1001.36 gives a trial court discretion to grant pretrial diversion for a defendant suffering from a mental disorder that was a "significant factor" in the commission of the charged offense.[6] (§ 1001.36, subd. (b)(1)(B).) Certain mental disorders, however, are expressly excluded, including antisocial personality disorder. (§ 1001.36, subd. (b)(1)(A).)

"Under the statutory scheme, a trial court may 'grant pretrial diversion to a defendant pursuant to this section if the defendant meets all of the requirements specified in paragraph (1) of subdivision (b).' (§ 1001.36, subd. (a).) . . . 'At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion . . . . If a prima facie showing is not made, the court may summarily deny the request for diversion or grant any other relief as may be deemed appropriate.' (§ 1001.36, subd. (b)(3).)" (*People v. Weaver* (2019) 36 Cal.App.5th 1103, 1115, fn. omitted (*Weaver*).)

"The statute defines ' "pretrial diversion" ' as 'the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment,' subject to multiple restrictions. (§ 1001.36, subd. (c).)" (*Weaver, supra*, 36 Cal.App.5th at p. 1115.)

Defendant's trial began in August 2019, and his counsel never requested mental health diversion.

---

[6] Section 1001.36 was subsequently amended twice. (Amended by Stats. 2018, ch. 1005, § 1 (Sen. Bill No. 215); Stats. 2019, ch. 497, § 203 (Assem. Bill No. 991).) The amendments are not pertinent to this appeal.

6

But in March 2019, months before trial commenced, the trial court declared a doubt as to defendant's competency to stand trial.  (§ 1368.)

A licensed psychologist interviewed defendant, reviewed the arrest report of the incident, and reviewed 84 pages of Sacramento County Correctional Health Services records (from periods of defendant's custody in jail both before and after his February 2019 arrest for the offenses here).

In a report dated May 8, 2019, the psychologist concluded defendant was competent to stand trial, and did "not have a major illness that require[d] the use of psychotropic medication."  He explained that, during a 90-minute clinical interview, defendant's "thought processes were organized and easy to follow," and defendant's "attention did not appear to wander."  And while defendant's "type of thinking reflect[ed] antisocial attitudes that underlie antisocial personality disorder," he "did not demonstrate signs of a major mood disorder or a psychotic disorder."

The trial court found defendant competent to stand trial at a hearing held on May 10, 2019.

*Analysis*

At the outset, the failure to request pretrial diversion forfeits the contention on appeal.  Further, we decline to exercise discretion to reach the merits.  We will, however, consider the ineffective assistance of counsel claim.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [104 S.Ct. 2052] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).)  A reviewing court may reject a claim of ineffective assistance of counsel without addressing both components if a defendant makes an insufficient showing as to either prong.  (*Strickland*, at p. 697.)

7

" 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [131 S.Ct. 770] (*Richter*).)  This is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial . . . ." (*Ibid*.)  Thus, we apply the *Strickland* standard "with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.' " (*Ibid*.)  To that end, "if the record ' "sheds no light on why counsel acted or failed to act in the manner challenged," ' we must reject the claim ' "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Caro* (2019) 7 Cal.5th 463, 488.)

To show prejudice, defendant must show a reasonable probability of a more favorable result had counsel's performance not been deficient.  (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)  "The likelihood of a different result must be substantial"—showing the errors had some conceivable effect on the outcome is insufficient.  (*Richter, supra*, 562 U.S. at pp. 104, 112.)

Here, defendant fails to demonstrate deficient performance, because a satisfactory explanation exists.[7]  The psychological evaluation prepared in connection with competency proceedings referenced antisocial personality, which is expressly excluded by section 1001.36 as a qualifying mental disorder.  Thus, trial counsel may have reasonably concluded defendant was ineligible for pretrial diversion.  (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].)

Further, defendant provides neither developed argument nor adequate citations to the record regarding how (i) his "trial testimony" and (ii) the "contents of the psychiatric

---

[7] Thus, we need not and do not address the prejudice prong.  (*Strickland, supra*, 466 U.S. at p. 697.)

evaluation" "suggest[ed]" defendant was "suffering from" qualifying mental disorders. We are not obliged to search the record or make arguments for a party, and thus reject as forfeited this claim, to the extent it rests on defendant's "trial testimony" and the "contents of the psychiatric evaluation." (*People v. Smith* (2015) 61 Cal.4th 18, 48; *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19; cf. *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287 [appellate court need not "scour the record unguided"; an appellant who does not "supply the reviewing court with some cogent argument supported by legal analysis and citation to the record" "has waived a point urged on appeal"].)[8]

And two of the three remaining discrete data points that defendant cites for why he "should have been referred for mental health evaluation to determine his eligibility for mental health diversion"—his forced removal at sentencing and his statements to a probation officer, conveyed in a September 2019 presentencing report—arose *after* the jury's verdicts, when the window of opportunity to pursue diversion arguably had already closed. (See *Weaver, supra*, 36 Cal.App.5th at p. 1120 ["the Legislature's intent" was "that individuals who commit their crimes after the effective date of section 1001.36 and whose guilt has been adjudicated in the form of a plea of guilty or no contest or a conviction after trial are no longer eligible for pretrial diversion under the statute"]; cf. *People v. Frahs* (2020) 9 Cal.5th 618, 632-633 & fn. 3 [noting the People's construction of the phrase "until adjudication" in section 1001.36, subdivision (c), to mean "until the charge or charges against a defendant are resolved," was a question the court had "no

---

[8] Relatedly, a transcript of the May 2019 hearing, at which defendant's competency was adjudicated, is not in the appellate record. It is plausible that, at that hearing, trial counsel and/or the trial court made statements germane to the instant claim. (Cf. *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 13 [because "[i]t was defendant's burden to affirmatively show error and to provide [the court] with an adequate record to review any issues raised on appeal," in the "[a]bsen[ce] [of] an adequate record," the court "presume[s]" no error].)

occasion" to decide, as it was "quite different from the specific retroactivity question"]; *People v. Torres* (2019) 39 Cal.App.5th 849, 855 [the phrase " '[u]ntil adjudication' " in section 1001.36, subdivision (c), "means before the jury is impaneled and sworn"], overruled on a different point of law (retroactivity) by *Frahs, supra*, 9 Cal.5th 618.)

For these reasons, the claim fails.

## II

Defendant argues the trial court erred in instructing the jury with CALCRIM No. 875, suggesting a box cutter could be an inherently deadly weapon. He argues this was an invalid legal theory and contends the error was prejudicial as there was no basis in the record for concluding the jury relied on the alternate, correct legal theory defining a deadly weapon. The People concede the error, but argue it was harmless beyond a reasonable doubt.

We agree with the People.

*Additional background*

The trial court instructed the jury with CALCRIM No. 875, delineating the elements of assault with a deadly weapon other than a firearm. The instruction defines a deadly weapon other than a firearm as: "[A]ny object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

In closing argument, the People did not mention the concept of an inherently deadly weapon. The People argued, "defendant did an act with a box cutter, which is the deadly weapon that we are alleging in this case . . . ." And: "All the evidence has shown that [defendant is] guilty of all these crimes, of threatening Ms. Gusman while . . . using a

10

deadly weapon, which is the box cutter. Because he made those threats while he was using it. And of assaulting Ms. Gusman with that deadly weapon."**9**

Nor did defendant argue the box cutter was not an inherently deadly weapon. Counsel argued, "there's a gap in the evidence. . . . [W]e had a lot of testimony about distances . . . [b]ut we didn't have . . . a lot of clarity about what those actual distances were . . . . [¶] And . . . it doesn't matter because none of the evidence about any of those distances would have allowed [defendant] to do an act that would naturally and probably lead to an application of force."

And: "So when we talk about . . . the assault with a deadly weapon charge, . . . even if everything those witnesses are saying is true, [defendant] was never doing anything with that box cutter that would have resulted in the application of force to a person. I mean, we saw him walking with the box cutter down at his side. It's in the video. Even if at some point he had it out extended like the witnesses say, but even by their own testimony, his arm is bent at his side. He's not thrusting it."

*Applicable case law*

*People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*) controls this case. There, the defendant threatened to kill his victim with a box cutter "from three or four feet away," and a jury found him guilty of assault with a deadly weapon and criminal threats (and, as to the threat charge, found true the section 12022, subd. (b)(1) allegation that defendant personally used a deadly and dangerous weapon). (*Aledamat*, at pp. 4-5) In *Aledamat* and here, the trial court instructed the jury with CALCRIM Nos. 875 and 3145 "that a

---

**9** Describing defendant's "conduct and what [he] did" to help the jury "determine if" defendant's "actions" amounted to assault, the prosecutor said: "[D]efendant was a few feet away from Ms. Gusman. He was running after her and had a knife or box cutter extended out in front of him. So just a few feet away from someone. And the only reason why Ms. Gusman wasn't stabbed . . . is because she backed up, and we saw that on the video."

weapon could be . . . inherently deadly *or* deadly in the way defendant used it."
(*Aledamat*, at p. 6.)

During closing argument in *Aledamat*, the prosecutor "argued that the box cutter was an 'inherently deadly weapon,' noting that 'you wouldn't want your children playing with' it." (*Aledamat, supra*, 8 Cal.5th. at p. 5.)  Defense counsel argued "the defendant did not use the box cutter in a way that would probably result in the application of force, that is, that defendant did not assault the victim at all—an argument the jury necessarily rejected when it found defendant guilty of that crime.  But counsel never argued that, if he did assault the victim with the box cutter, the box cutter was not a deadly weapon.  Although defense counsel did not expressly concede that the box cutter was a deadly weapon, he did not contest the point." (*Id*. at p. 14.)

The appellate court reversed the assault conviction and true finding on the weapon allegation, finding the jury instructions "erroneously permitted the jury to find the box cutter to be an inherently deadly weapon" and further finding there was " 'no basis in the record for concluding that the jury relied on the alternative definition of "deadly weapon" (that is, the definition looking to how a noninherently dangerous weapon was actually used).' " (*Aledamat, supra*, 8 Cal.5th at p. 5.)

Our Supreme Court reversed,[10] holding that the *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824], harmless error standard is the correct test for evaluating prejudice in cases of presentation of an invalid legal theory to a jury.  (*Aledamat, supra*, 8 Cal.5th at pp. 12-13.)  Under this standard, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and

---

[10]  But agreed that, because a box cutter is "*not* an inherently deadly weapon," the trial court's failure to "define what 'inherently deadly' meant," amounted to presentation to the jury of a legally invalid theory.  (*Aledamat, supra*, 8 Cal.5th at p. 8.)

considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id*. at p. 13)

The *Aledamat* court concluded the instructional error was harmless, applying a "nonexclusive" approach to determining harmlessness: "[E]xamin[ing] what the jury necessarily did find and ask[ing] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well." (*Aledamat, supra*, 8 Cal.5th at p. 15.) The court concluded that under the CALCRIM No. 875 instructions, "the jury necessarily found the following: (1) defendant did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force; (2) defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (3) defendant had the present ability to apply force with a deadly weapon to a person." (*Aledamat*, at p. 15.)

The court concluded that in light of those findings, the jury necessarily found the instrument deadly as used and the error was harmless beyond a reasonable doubt because, " 'No reasonable jury that made all of these findings could have failed to find' that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury." (*Aledamat, supra*, 8 Cal.5th at p. 15.)

*Analysis*

Here, as in *Aledamat*, defendant did not dispute that a box cutter can constitute a deadly weapon if used in such a way that it is capable of causing and is likely to cause death or great bodily injury. The evidence showed defendant used the box cutter in such a manner when, from about four feet away, he held in his hand an unsheathed box cutter and pursued his victim onto a light rail car.

Defendant did not contest that this use was capable of causing great bodily injury or death. Rather, defendant argued he did not *assault* Gusman, as he was too far away from Gusman. The nature of defense counsel's argument supports our conclusion. (See

13

*Aledamat, supra*, 8 Cal.5th at p. 14 [defense counsel's argument to the jury "support[ed]" the court's harmlessness conclusion, as counsel argued "that defendant did not assault the victim at all," but "never argued that, if he did assault the victim with the box cutter, the box cutter was not a deadly weapon"].)

Defendant argues that an important distinction between the instant case and *Aledamat* is that the jury in *Aledamat* received an additional instruction,[11] which the *Aledamat* court "noted with approval" in explaining its harmlessness conclusion. We are not persuaded.

That additional instruction was not essential to the holding in *Aledamat*. It was one relevant factor the court discussed by way of explaining the "nonexclusive way" it found the instructional error to be harmless beyond a reasonable doubt. And while this is a difference between the instant case and *Aledamat*, we do not think it is a dispositive one. Indeed, another difference between the cases is that here, the prosecutor did *not* reference the "inherently deadly" weapon concept, though the prosecutor in *Aledamat did*. (*Aledamat, supra*, 8 Cal.5th at p. 5.)

Thus, as in *Aledamat*, we conclude that under the instructions given to the jury, it necessarily found: (1) defendant did an act—he held an unsheathed box cutter in his hand while pursuing Gusman from about four feet away—that (either inherently or as used) would directly and probably result in the application of force; (2) defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to Gusman; and (3) defendant had the present ability to apply force with a deadly weapon to Gusman, as he

---

[11] "The jury would likely view the 'inherently deadly' language in light of this additional instruction that it had to consider all of the circumstances. Given this additional instruction, it seems unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it." (*Aledamat, supra*, 8 Cal.5th at p. 14.)

in fact positioned himself to do so.  In making these findings, the jury also necessarily found that the box cutter was used in such a way that it was capable of causing and likely to cause death or great bodily injury; therefore, any error was harmless beyond a reasonable doubt.

Put another way,  given the weight of the evidence and testimony focusing on how defendant used the box cutter, the arguments of both counsel, and the fact the People did not even mention the invalid theory, any error in not omitting the language concerning an "inherently deadly" weapon when defining a "deadly weapon" was harmless beyond a reasonable doubt.  We are persuaded beyond a reasonable doubt the error in CALCRIM No. 875 was unimportant in relation to everything else the jury considered.  (*People v. Brown* (2012) 210 Cal.App.4th 1, 13-14.)

### III

Invoking *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant contends the trial court violated due process principles by imposing costs that it believed were mandatory, and therefore, the matter should be remanded for a determination of his ability to pay the costs.  We disagree.

At sentencing, in response to counsel's request the court strike "all fines and fees" due to defendant's "indigent status," the trial court said:  "Well, some we have to impose, they're mandatory, and then if he's unable to pay, he's entitled to a hearing.  The minimum, though."  The abstract of judgment reflects imposition of the statutory mandatory minimum costs.

*Dueñas, supra*, 30 Cal.App.5th 1157, held that due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has determined the defendant has the present ability to pay.  (*Id*. at pp. 1172-1173.)  On appeal, defendant argues that *Dueñas* applies to his case.

The People disagree.

We join the courts concluding *Dueñas* was wrongly decided. (See, e.g., *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1069.)

Accordingly, the claim fails.

## DISPOSITION

The judgment is affirmed.

      /s/          

RAYE, P. J.

We concur:

     /s/       

HOCH, J.

     /s/       

RENNER, J.