Filed 9/11/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr><td>THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JORDAN CHRISTOPHER HUGHES,<br><br>     Defendant and Appellant.</td><td>A154196<br><br>(Solano County<br>Super. Ct. No. FCR285903)</td></tr>
</table>

A jury convicted Jordan Christopher Hughes of attempted murder of a peace officer (Pen. Code, §§ 187 subd. (a), 664)[1] and three counts of assault with a firearm on a peace officer (§ 245, subd. (d)(1)). The jury also found that Hughes personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) in committing all four offenses. In a prior appeal, *People v. Hughes* (May 18, 2017, A145853) (nonpub. opn.) (*Hughes I*)), this Division conditionally reversed Hughes's convictions and remanded for the trial court to conduct an in camera *Pitchess*[2] hearing. If a new trial was not ordered, Hughes was to be resentenced. Hughes appeals for a second time, asking us to examine the *Pitchess* records produced and deemed undiscoverable on remand. He also argues that recently enacted mental health diversion statutes (§§ 1001.35, 1001.36) apply retroactively to nonfinal cases and that sentencing errors and clerical mistakes in the abstract of judgment require modification.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B., C., D., and E. of the Discussion.

[1] Undesignated statutory references are to the Penal Code.

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

1

In the published portion of our opinion, we hold that section 1001.36 applies retroactively. In the unpublished portion of our opinion, we address Hughes's remaining arguments and agree that a conditional reversal and remand is appropriate so the trial court may consider his diversion eligibility. If on remand the court determines Hughes is not eligible for section 1001.36 relief, his convictions and sentence are reinstated, and the trial court is directed to stay the sentence for the firearm enhancement to count four and issue a modified abstract of judgment making clerical corrections and reflecting Hughes's 2,466 actual time credits. Otherwise, we affirm.

## BACKGROUND

### A.

On June 26, 2011, at 10:16 p.m., Fairfield Police Department Officer Neal was dispatched to an apartment complex in Fairfield where O.D. was sitting in a van with his daughter J.D. J.D. was Hughes's girlfriend and lived in apartment 17. The couple had been involved in a domestic dispute earlier that evening, and O.D. had driven J.D. back to her apartment to grab some belongings. She wanted officers to check the apartment before she went inside. J.D. had not seen Hughes with a gun that day but had seen him armed with a gun in the past.

Officer White arrived on the scene while Officer Neal obtained keys to the apartment from J.D. When the officers entered the apartment, they smelled marijuana. Officer Neal repeatedly yelled, "Fairfield Police Department. Anyone inside Apartment 17 make yourself known." He also called Hughes by his name, but neither officer heard anything in response or detected movement. After they "cleared" the kitchen, bedroom and living room, they discovered the bathroom door was locked. Officer Neal advised Officer White they needed backup and went outside to get more information.

Officer Neal asked J.D. about the marijuana odor, and she told him that while she did not smoke, Hughes did. Asked about the bathroom door, J.D. said it had been unlocked when she left and if it was locked, then Hughes had probably killed himself. She explained that Hughes always said he was going to kill himself when they fought.

2

Officer Grimm and Sergeant Oviatt arrived and joined officers Neal and White. Officer Neal told the other officers about the possible firearm and suicide and said they "obviously had to open the bathroom door and force entry into the bathroom." He devised a plan in which he would holster his weapon, kick the bathroom door open, and then run down the hallway toward Sergeant Oviatt as Officer Grimm and Officer White entered the bathroom behind him. Sergeant Oviatt would provide cover for all three officers.

Before entering the bathroom, Officer Neal repeatedly shouted, "Jordan, it's the Fairfield Police Department. You need to come out if you're inside." When there was no response, Officer Neal kicked the bathroom door open, as planned, and Hughes immediately fired five shots. Officer Neal fell down and then pushed Officer White and Officer Grimm toward the bedroom at their end of the hall while Sergeant Oviatt fired shots into the bathroom, hitting Hughes. The bathroom door closed and a status check revealed that none of the officers was injured. Approximately ten minutes elapsed between Officer Neal's arrival on the scene and the time shots were fired.

An officer outside notified Sergeant Oviatt that Hughes was texting family members. Sergeant Oviatt yelled, "Jordan, I know you're in there. I know that you're text messaging people." Hughes called out that he was injured, and Sergeant Oviatt offered to provide him with medical attention. After 45 minutes to an hour, Hughes opened the door and crawled out of the bathroom, where he was arrested and transported to the hospital. A revolver was found on the bathroom floor.

Hughes testified that he had been inside the bathroom with a gun because he was high and was considering killing himself. He had the gun because he had been robbed at gunpoint by a friend the previous December and remained traumatized and fearful for his life at all times. Hughes heard people inside the apartment but did not hear them say they were police. He fired his gun blindly when the door was kicked in to scare whomever was in the apartment, but he did not want to kill anyone. Hughes realized the people were police officers only after he had been shot when he heard someone call for a riot shield.

The defense also called Roger Clark, a retired Los Angeles County Sheriff's Deputy and police procedures consultant, to testify about the appropriate way to deal with mentally ill or suicidal individuals. When asked a hypothetical question based on the facts of this case, he was critical of the officers' decision to kick down the door. Clark explained that when a subject is barricaded in a room where he cannot escape, officers should set up a line of communication and attempt to get him to come out on his own. Entering the room by force was too risky for the officers.

**B.**

An amended information charged Hughes with three counts of attempted murder against Officers Neal, White, and Grimm (§§ 664, 187, subd. (a); counts one-three), and alleged the crimes were premeditated and committed against peace officers engaged in the performance of their duties (§ 664, subds. (e), (f)). Hughes was also charged with four counts of assault with a firearm on a peace officer (§ 245, subd. (d)(1); counts four-seven), naming as victims Officers Neal, White, and Grimm, and Sergeant Oviatt. As to all seven counts, it was further alleged Hughes had personally and intentionally discharged a firearm under section 12022.53, subdivision (c).

The jury acquitted Hughes of the attempted murder counts naming Officers White and Grimm as victims (counts two-three) but convicted him of the attempted murder of Officer Neal (count one) and found true the allegation that count one was committed against a peace officer in the performance of his duties. It found untrue the allegation that the attempted murder of Officer Neal was premeditated. The jury also convicted Hughes of three counts of assault with a firearm on a peace officer as to Officers Neal, White, and Grimm (counts four-six), but acquitted him of the assault count against Sergeant Oviatt (count seven). Firearm enhancement allegations under section 12022.53, subdivision (c), were found true as to each count of conviction.

Hughes was originally sentenced to a term of life with the possibility of parole on the attempted murder count (count one) with a 20-year consecutive term for that count's firearm enhancement (§ 12022.53, subd. (c)). The trial court stayed, under section 654, the sentence on the assault with a firearm count involving Officer Neal (count four),

4

including the 20-year term for the section 12022.53 subdivision (c) enhancement attached to that count. Finding neither mitigating nor aggravating circumstances predominant, the trial court imposed a consecutive six-year middle term for the assault count involving Officer White (count five) plus a two-year consecutive term (one-third the middle term) for the assault count involving Officer Grimm (count six) (§§ 245, subd. (d)(1), 1170.1, subd. (a)), but stayed the firearm enhancement terms attached to both counts under section 654.

## C.

Hughes appealed. In *Hughes I*, this Division conditionally reversed the judgment and remanded the matter for an in camera *Pitchess* review of Officers Neal, White and Grimm's, and Sergeant Oviatt's personnel records. In the event a new trial was not ordered after the *Pitchess* review, *Hughes I* ordered reinstatement of the judgment of conviction and resentencing because the trial court's stay of the firearm enhancement terms for counts five and six was unauthorized, given that these counts "(unlike count 4) involved different victims" than count one. (*Id*. at 13, 1, 14.)

After issuance of the remittitur, the trial court conducted an in camera review of the officers' personnel files and concluded no materials were discoverable. Hughes's trial counsel filed a resentencing brief, asking the trial court to consider his youth (21 years old in 2011) and mental illness in exercising its discretion to strike the firearm enhancements, under section 12022.53, subdivision (h). In support, defense counsel attached reports from a neuropsychologist, Dr. Friedman, who diagnosed Hughes as suffering from major depressive disorder and posttraumatic stress disorder.

At resentencing, the trial court declined to strike the firearm enhancements and, consistent with the People's request, again imposed the same aggregate sentence. The sentence is comprised of an indeterminate term of life with the possibility of parole on count one, a consecutive 20-year term for count one's firearm enhancement, a consecutive midterm of six years on count five, and a consecutive one-third midterm of two years on count six. The court again stayed the sentence on count four pursuant to

5

section 654 but imposed (without stay) concurrent 20-year terms for the firearm enhancements on each of counts four, five, and six.

## DISCUSSION

### A.

Hughes argues a recently enacted statute allowing for pretrial mental health diversion (§ 1001.36) applies retroactively and that this matter must be remanded for a determination of his eligibility. The People disagree, contending the statute operates only prospectively. Hughes has the better argument.

### 1.

While the instant appeal was pending, the Legislature enacted sections 1001.35 and 1001.36 as part of Assembly Bill No. 1810 (Stats. 2018, ch. 34, §§ 24, 37), with the goal of promoting "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety" and "meet[ing] the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a), (c).)

Section 1001.36 gives the trial court discretion to "grant pretrial diversion" if the defendant meets all of six eligibility requirements. (§ 1001.36, subds. (a)-(b).) "Pretrial diversion" is statutorily defined to mean "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged *until adjudication*, to allow the defendant to undergo mental health treatment . . . ." (§ 1001.36, subd. (c), italics added.)

To be eligible, the court must be "satisfied that the defendant suffers from a mental disorder . . . including, but not limited to . . . post-traumatic stress disorder." (§ 1001.36, subd. (b)(1)(A).) Second, the court must also be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) Third, "a qualified mental health expert" must opine that "the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) Fourth, subject to certain exceptions, the defendant must consent to diversion and waive his or her right to a

6

speedy trial.  (§ 1001.36, subd. (b)(1)(D).)  Fifth, the defendant must agree "to comply with treatment as a condition of diversion."  (§ 1001.36, subd. (b)(1)(E).)  Finally, the court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community."  (§ 1001.36, subd. (b)(1)(F).)  Defendants charged with certain crimes, including murder, voluntary manslaughter, and rape, are also statutorily excluded.  (§ 1001.36, subd. (b)(2).)

If a defendant meets the eligibility requirements, the trial court must also determine whether "the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant."  (§ 1001.36, subd. (c)(1)(A).)  The court may then grant diversion and refer the defendant to an approved treatment program (§ 1001.36, subd. (c)(1)(B)), and the program "shall provide regular reports to the court, the defense, and the prosecutor on the defendant's progress in treatment."  (§ 1001.36, subd. (c)(2).)  "The period during which criminal proceedings against the defendant may be diverted shall be no longer than two years."  (§ 1001.36, subd. (c)(3).)

If the defendant is charged with additional crimes, or otherwise performs unsatisfactorily while in treatment, the court may reinstate criminal proceedings.  (§ 1001.36, subd. (d).)  However, if the defendant "satisfactorily" completes the diversion program, the court shall dismiss the criminal charges.  (§ 1001.36, subd. (e).)


**2.**

We now turn to the question of whether section 1001.36 applies retroactively. Whether a statute operates retroactively or prospectively is a question of legislative intent.  (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307.)  The default rule is provided by section 3: "No part of [the Penal Code] is retroactive, unless expressly so declared."  There is a qualification to this default rule, however:  Absent contrary indications, a law that potentially ameliorates punishment for a particular crime or class of defendants will apply retroactively to all cases not final on appeal.  (*Lara, supra*, at pp. 303-304, 307, citing *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).)  "The *Estrada* rule

rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 881.)

The People do not dispute that section 1001.36 is potentially ameliorative for a class of defendants – those diagnosed with certain mental disorders. (§ 1001.36, subds. (a), (b), & (e).) Instead, they argue the Legislature "clearly signal[ed] its intent" to rebut the *Estrada* inference. (*People v. Nasalga* (1996) 12 Cal.4th 784, 793.)

Hughes, on the other hand, relies on *Lara, supra*, 4 Cal.5th 299 and *People v. Frahs* (2018) 27 Cal.App.5th 784 (*Frahs*), review granted December 27, 2018, S252220. In *Frahs*, the Fourth District Court of Appeal held section 1001.36 applies retroactively to cases not yet final on appeal.[3] (*Id*. at p. 791; accord, *People v. Weaver* (2019) 36 Cal.App.5th 1103, 1121.) Because it is integral to *Frahs*, we begin with *Lara*.

In *Lara*, our Supreme Court considered Proposition 57 (Welf. & Inst. Code, §§ 602, 707, subds. (a)-(b)), which eliminated the People's ability to directly charge juvenile offenders outside of juvenile court. (*Lara, supra*, 4 Cal.5th at pp. 304-305.) After Proposition 57, certain juveniles may still be tried as adults in criminal court, but only after the prosecutor files a motion to transfer, the juvenile court conducts a transfer hearing, and the juvenile court (not the prosecutor) determines the matter should be transferred to adult court. (*Lara*, at pp. 303, 305; former Welf. & Inst. Code, § 707, subd. (a), as amended by voters, Prop. 57 § 4.2, effective November 9, 2016.) Despite the initiative's language requiring the transfer motion be filed "prior to the attachment of jeopardy" (former Welf. & Inst. Code, § 707, subd. (a)), the *Lara* court concluded the

---

[3] The issue is before the California Supreme Court. (See *Frahs, supra,* 27 Cal.App.5th 784, review granted Dec. 27, 2018, S252220.) Because our Supreme Court denied depublication of *Frahs* pending review, it "has no binding or precedential effect" but may be cited for persuasive value. (Cal. Rules of Court, rule 8.1115(e)(1), eff. July 1, 2016.)

electorate intended Proposition 57 to apply retroactively to a defendant already charged, tried, and convicted as an adult before Proposition 57 took effect, as long as his judgment was not final. (*Lara*, at p. 304.) The court did not explicitly address the "attachment of jeopardy" language but reasoned that Proposition 57 gives rise to an inference of retroactivity through its reduction of "the possible punishment for a class of persons," and because "nothing in Proposition 57's text or ballot materials rebuts this inference." (*Lara,* at pp. 303-304, 308-309.)

*Frahs, supra,* 27 Cal.App.5th 784 followed *Lara,* explaining: "[S]imilar to Proposition 57, the mental health diversion program under section 1001.36 does not lessen the punishment for a particular crime. However, for a defendant with a diagnosed mental disorder, it is unquestionably an 'ameliorating benefit' to have the opportunity for diversion—and ultimately a possible dismissal—under section 1001.36." (*Frahs, supra,* at p. 791.) The *Frahs* court conditionally reversed the defendant's conviction and sentence, instructing the trial court to conduct a mental health diversion eligibility hearing on remand. (*Id.* at p. 792.)

The People contend *Frahs* was incorrectly decided. They emphasize that section 1001.36 enacted only a *pretrial* diversion program that is available from the point at which the accused is charged "until adjudication." (§ 1001.36, subd. (c).) They argue that this language unmistakably demonstrates a Legislative intent to apply the statute only if the defendant has not yet been convicted. (See *People v. Craine* (2019) 35 Cal.App.5th 744, 756 ["Pursuant to the Legislature's own terminology, pretrial diversion is literally and functionally impossible once a defendant has been tried, found guilty, and sentenced"].)

*Frahs* rejected this argument: "The fact that mental health diversion is available only up until the time that a defendant's case is 'adjudicated' is simply how this particular diversion program is ordinarily designed to operate. Indeed, the fact that a juvenile transfer hearing under Proposition 57 ordinarily occurs prior to the attachment of jeopardy, did not prevent the Supreme Court in *Lara, supra*, 4 Cal.5th 299, from finding

9

that such a hearing must be made available to all defendants whose convictions are not yet final on appeal." (*Frahs, supra*, 27 Cal.App.5th at p. 791.)

Because our Supreme Court will soon decide the retroactivity question, we need not belabor the point. Although the People's position has initial appeal, we are ultimately unpersuaded that the Legislature's intent is sufficiently clear to rebut the *Estrada* inference. At base, the People argue that because section 1001.36 does not apply *prospectively* to cases after adjudication, it should not apply retroactively under *Estrada*. Were we to so hold, our decision would be in tension with *Lara* and other binding authority. (See *Lara, supra*, 4 Cal.5th at pp. 303-304, 308-309; see also *People v. Francis* (1969) 71 Cal.2d 66, 75, 77-78 [rejecting argument that because relevant statutory amendment "vests discretionary *sentencing* power in the trial court, 'the very nature' of the amendment leads to the conclusion that it was only intended to apply to cases where sentencing occurred after . . . amendment." (italics added)].)

We agree with the *Frahs* court that section 1001.36 applies retroactively to cases in which judgment is not yet final. (*Frahs, supra,* 27 Cal.App.4th at p. 788.)

**B.**

The People alternatively argue a conditional remand would be futile because there is no possibility Hughes can establish the final eligibility criterion, which requires the trial court be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (b)(1)(F).)

**1.**

An "unreasonable risk of danger to public safety" means "an unreasonable risk that the petitioner will commit a new violent felony" described in section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c).) "These violent felonies are known as 'super strikes' and include murder, *attempted murder*, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by death or life imprisonment." (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 242, italics added; accord, § 667, subd.

10

(e)(2)(C)(iv).)  In assessing risk, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (b)(1)(F).)

**2.**

On remand in *Hughes I*, before the Legislature passed Assembly Bill No. 1810, Hughes's trial counsel asked the trial court to consider his mental illness in exercising its discretion to strike the firearm enhancements, under 12022.53, subdivision (h).  In support, defense counsel attached two reports from Dr. Friedman, who evaluated Hughes in 2012, before trial, and again in 2018, before resentencing.

In 2012, Dr. Friedman stated both of Hughes's conditions (major depressive disorder and posttraumatic stress disorder) impacted his ability to think logically at the time of the shooting.  Hughes reported being "uncertain" about why he fired the gun, but said, in some conflict with his testimony at trial, "maybe he was wanting the police to kill him." Dr. Friedman concluded Hughes "does not display aggressive tendencies" and was unlikely to "direct[ly] harm" others.  But, because his "suicidal potential persist[ed]," in 2012, "the more likely target of his actions would be himself."  Dr. Friedman saw "the potential for improvement with more comprehensive treatment."

In 2018, Hughes reported no longer feeling depressed or suffering nightmares.  Dr. Friedman opined that Hughes had recovered from both posttraumatic stress disorder and major depressive disorder and was no longer "dangerous to other individuals or to society at large."

At resentencing, the trial court declined to strike the firearm enhancements and imposed the same aggregate term as it had originally.  The trial court explained that Hughes's case involves "unusual circumstances," in that "[he] clearly was trying to likely draw fire from the officers," it was "miraculous" that none of the officers were injured, and "it wasn't clear to the Court . . . what area [Hughes] was shooting towards."  The court said, "[T]hat is why I didn't originally impose all the terms [in] full consecutively. I tried to look at the youth of the defendant, the *mitigating circumstances concerning his*

11

*mental health*, as well as what he knew to be true and the imminent danger to the police officers who, fortunately, were not injured. . . . I think the original sentence . . . was appropriate because it would give [Hughes], with good behavior, the opportunity to parole while he was still a young man. . . . I think that's a just sentence, all things considered." (Italics added.)

**3.**

We disagree with the People that the record compels a conclusion, as a matter of law, that Hughes poses an unreasonable risk of danger to public safety if treated in the community. The People are correct that the trial court indicated Hughes's substantial prison sentence was "just" and "commensurate with [his] actions." It also declined to reduce Hughes's prison sentence by striking or dismissing any of the firearm enhancements in furtherance of justice. (See § 12022.53, subd. (h).)

However, those sentencing determinations were made under a different calculus. (See *People v. Burns* 38 Cal.App.5th 776, 789.) Section 1001.36, subdivision (b)(1)(F), provides a high standard for disqualifying dangerousness: the trial court is to consider whether Hughes's risk of committing a new super strike would be sufficiently mitigated by inpatient or outpatient mental health treatment. (See *Ibid.*) The trial court's statements at resentencing are not particularly revealing on this question, which is understandable given that the trial court has had no opportunity to consider it. The trial court also expressly recognized that this case presents "unusual circumstances" and found Hughes's mental health challenges to be mitigating.

Hughes may very well face an uphill battle due to the nature of the charges – three of his six current charges qualify as "super strikes" (§ 667, subd. (e)(2)(C)(iv)) – and his history as a juvenile ward. (See *People v. Burns, supra,* 38 Cal.App.5th at p. 789 [conditional reversal "restores the case to its procedural posture before the jury verdict for purposes of evaluating [the defendant's] eligibility for pretrial mental health diversion"]; *Frahs, supra*, 27 Cal.App.5th at p. 792 [trial court "shall . . . treat the matter as though [the defendant] had moved for pretrial diversion after the charges had been filed, but prior to their adjudication"].) But section 1001.36 does not categorically

exclude defendants charged with attempted murder or assault with a firearm on a peace officer from eligibility for pretrial mental health diversion. (§ 1001.36, subd. (b)(2)(A) – (b)(2)(H) [prohibiting diversion for defendants charged with "[m]urder or voluntary manslaughter," rape, possession of a weapon of mass destruction, and other sex offenses].)

Because the trial court did not clearly indicate it would find Hughes ineligible for mental health diversion, this factual determination should be made by the trial court in the first instance. (*People v. Burns, supra,* 38 Cal.App.5th at p. 789; *People v. Jefferson* (2019) 38 Cal.App.5th 399, 407-408.)

## C.

In the event he is not granted pretrial diversion, Hughes asks us to review the sealed *Pitchess* transcript and personnel records produced at the in camera hearing to determine whether the trial court abused its discretion by withholding discoverable records. The People concede Hughes is entitled to such review.

## 1.

Hughes's defense counsel filed a pretrial motion for the discovery of the police personnel records of Officers Neal, White and Grimm, and Sergeant Oviatt, seeking "any evidence or complaints of official misconduct, harassment, improper or excessive use of force, conduct unbecoming a police officer, illegal detention/arrests, false statements in reports, false claims of reasonable or probable cause, evidence of racial or class bias, or any other evidence or complaints of dishonesty." Disclosure was sought on the basis the information was necessary to fully cross-examine prosecution witnesses and to fully investigate and prepare all defenses, including that the officers were not acting in lawful performance of their duties because they used excessive force in kicking down the door of the bathroom despite knowing Hughes was possibly suicidal and in possession of a gun. The trial court denied Hughes's motion, concluding it was "overbroad and not supported by good cause."

In *Hughes I*, this Division concluded the trial court abused its discretion in denying the motion as overbroad with respect to evidence and complaints concerning

13

prior incidents of excessive force. *Hughes I* remanded to the trial court for an in camera review of the officers' personnel files for claims of excessive force, but also cautioned: "Because [Hughes's] challenge to the lawfulness of the officers' conduct in this case pertains to their decision to go forward with a forcible entry rather than to employ other means of persuading him to leave the bathroom, claims of other types of excessive force (unnecessary roughness during an arrest, etc.) may not be relevant to the pending case or subject to discovery."

After the remittitur issued in *Hughes I*, the trial court conducted an in camera review of the officers' personnel files for information relevant to Hughes's excessive force defense and concluded no materials were discoverable.

**2.**

We review the trial court's decisions regarding discovery of an officer's personnel records for abuse of discretion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228.) It is the trial court's responsibility, in order to permit appellate review, to "make a record of what documents it examined before ruling on the *Pitchess* motion. . . . If the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file. Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what documents it examined. Without some record of the documents examined by the trial court, a party's ability to obtain appellate review of the trial court's decision, whether to disclose or not to disclose, would be nonexistent." (*Id.* at p. 1229.)

Here, Hughes's appellate counsel properly attempted to augment the record to obtain a settled statement of the trial court's in camera review. In response to our order granting Hughes's application, we received the sealed transcript from the in camera review, but we did not receive a copy of the documents the trial court reviewed or a log of such documents. Thus, we have only the sealed transcript of the trial court's in camera review, in which the court "state[d] for the record what documents it examined." (*Mooc, supra*, 26 Cal.4th at p. 1229.) When the confidential personnel files themselves are subsequently unavailable, the appellate court may conduct an adequate review by

14

considering only the sealed transcript. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209.) Having independently reviewed the sealed transcript, we conclude the trial court did not abuse its discretion in refusing to disclose any records from the officers' personnel files.

**D.**

Hughes also contends the term imposed for the firearm enhancement (§ 12022.53, subd. (c)) to count four (assault of Officer Neal) should have been stayed along with the substantive offense. The People concede the trial court erred (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1015-1016; *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1310), and concede we may modify the sentence because the record does not suggest the trial court intended to change the sentence in this respect. Accordingly, in the event Hughes is not eligible for section 1001.36 relief, his convictions and sentence are reinstated, and the trial court is directed to stay the term imposed on count four's firearm enhancement under section 12022.53, subdivision (c).

**E.**

Finally, Hughes points out two clerical errors in the modified abstract of judgment (referring to the original sentencing date rather than the resentencing date and failing to reflect his indeterminate term). He also contends the trial court failed, at the resentencing hearing, to calculate his actual custody credits through the date of resentencing.

The People concede the clerical errors must be corrected, and also concede the trial court's error in failing to recalculate actual custody credits and reflect them in the amended abstract of judgment. (*People v. Buckhalter* (2001) 26 Cal.4th 20, 29 ["when a prison term already in progress is modified as the result of an appellate sentence remand, the sentencing court must recalculate and credit against the modified sentence *all actual time* the defendant has already served, whether in jail or prison"]; § 2900.1.) The parties agree Hughes had served 2,466 days when he was resentenced on March 26, 2018. In the event Hughes is found ineligible for diversion or is granted diversion but does not successfully complete it, we direct the trial court to issue a modified abstract of judgment reflecting Hughes's 2,466 actual time credits at resentencing and to otherwise correct the abstract.

15

### DISPOSITION

The judgment is conditionally reversed, and the case is remanded to the trial court with directions to conduct a diversion eligibility hearing, under section 1001.36. If the trial court determines that Hughes qualifies for diversion under section 1001.36, then the court may grant diversion. If Hughes successfully completes diversion, then the trial court shall dismiss the charges.

If the trial court determines that Hughes is ineligible for diversion, or it grants diversion but Hughes does not successfully complete it, then his convictions and sentence are reinstated. The trial court is further directed to stay the term imposed on the firearm enhancement to count four; award Hughes 2,466 actual time credits through the date of his resentencing; and prepare an amended abstract of judgment consistent with this opinion. A copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____
BURNS, J.


WE CONCUR:


_____
JONES, P. J.


_____
NEEDHAM, J.

A154196
Superior Court of Solano County, No. FCR285903, Donna Stashyn, Judge.

Xavier Beccera, Attorney General of California, Gerald A. Engler, Chief Assistant Attorney Generral, Jeffrey M. Laurence, Senior Assistant Attorney General, Arthur P. Beever, Deputy Attorney General, and Lisa Ashely Ott, Deputy Attorney General, for Plaintiff and Respondent.

Catherine A. White, under appointment by the Court of Appeal, for Defendant and Appellant.