Filed 2/21/20

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045282 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS160402) |
| v. | |
| HARLEY WAYNE LIPSETT, | |
| Defendant and Appellant. | |

Defendant Harley Wayne Lipsett pleaded guilty to battery on a nonprisoner by a prisoner (Pen. Code, § 4501.5)[1] and admitted that he had suffered a prior conviction that qualified as a strike (§§ 667, subds. (b)-(i), 1170.12). The trial court sentenced defendant to six years in prison. On appeal, defendant contends that the trial court abused its discretion and violated his constitutional rights when it denied his request to strike the strike. He also contends that this case should be remanded to determine his eligibility for mental health diversion pursuant to section 1001.36. We reject defendant's arguments and affirm the judgment.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.A.

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

# I.  Statement of Facts[2]

On March 23, 2015, an officer at Salinas Valley State Prison was conducting a security check when defendant "threw liquid fecal matter through the crack of his cell door, striking the officer in the left arm, left leg, head, hat, and left boot."  Additional officers responded and found that defendant's cell smelled of urine and fecal matter.  Defendant "was standing in front of his door yelling, 'I got him and I got Hep C!'"  Defendant had cut himself on his arm and was dripping blood.  When asked why he had thrown the liquid fecal matter, defendant replied, "It doesn't matter, I'm getting out of here anyway and there's nothing you can fucking do!"

# II.  Procedural Background

Defendant initially pleaded not guilty by reason of insanity, and the parties stipulated to the appointment of two psychologists to examine defendant.  Dr. Carolyn Murphy found that defendant was capable of distinguishing between right and wrong and that defendant did know the nature and quality of his actions on the date of the offense.  Dr. Edward Macias could not make a determination of defendant's mental status "due to limited records made available for this evaluation."  The parties then stipulated to the appointment of a third psychologist, Dr. Thomas Reidy, who found that defendant "knew the nature and quality of his actions" and that he "understood that his behavior was wrong."  He also agreed with the other examiners that defendant "exhibits severe personality disorder, substance abuse and dependence, and a Schizophrenia Spectrum Disorder."  Defendant thereafter withdrew his plea of not guilty by reason of insanity.

The probation report noted that defendant was 37 years old and had an extensive criminal history.  In 1994, defendant was committed at age 13 to the California Youth

---

[2]     The statement of facts is based on the probation report.

Authority (CYA)[3] for residential burglary (§ 459). In 1999, at age 19, defendant committed misdemeanor assault against a peace officer while at a CYA facility, resulting in a 365-day jail sentence (§ 243, subd. (b)). In 2000, while at a different CYA facility, defendant committed felony assault by a confined person against a person not confined (Welf. & Inst. Code, § 1768.8, subd. (b)). He was sentenced to four years in prison. In 2001, defendant was transferred to the Department of Corrections and Rehabilitation.

In 2002, defendant was convicted of battery on a nonprisoner by a prisoner and was sentenced to two years in prison (§ 4501.5). Twice in 2004, defendant again committed battery on a nonprisoner by a prisoner (§ 4501.5). Criminal proceedings related to both offenses were suspended because defendant was found not competent to stand trial. After his competency was restored in 2006, defendant was convicted and sentenced to two consecutive one-year terms. In 2010, while on parole, defendant was convicted of attempted first degree burglary (§§ 459, 664) and sentenced to two years in prison. He was also found to have violated the conditions of his parole for the 2004 battery convictions.

In 2012, defendant committed felony assault (§ 245, subd. (a)(4)). Proceedings were suspended in 2013 because defendant was found not competent to stand trial. Defendant was detained at Napa State Hospital pending restoration of his competency. While detained there, defendant resisted a peace officer and vandalized property (§§ 69, 594, subd. (b)(1)). In 2014, defendant was found mentally competent and discharged from the hospital. He was thereafter convicted of the hospital-related offenses and sentenced to three years and four months in prison. In 2015, proceedings resumed in the 2012 assault case, and defendant was convicted and sentenced to four years in prison.

At the sentencing hearing in the current case, defense counsel requested that the court strike the strike. Counsel characterized defendant as "a person who never had an

---

[3]    The former CYA is now known as the Division of Juvenile Justice.

opportunity to live to his full potential, to any potential, really." Describing defendant's upbringing, counsel noted: "What is described in the probation report is somebody who was put under the influence of drugs at the age starting at five, and that is -- that is not volitional on his part, at all." Counsel further noted that defendant "entered the juvenile justice system at age 11 and went to CYA at age 14." Defendant had not, counsel asserted, been able to "function in a way that allows him to be free from these institutions."

Defense counsel argued that defendant's case was one that did not fall "within the spirit of the Three Strikes Law." He explained: "He has engaged in zero assaultive behavior, except for those -- against those people who are exercises [*sic*] complete dominion over his ability to function. He has not engaged in assaultive behavior outside of the prison context, with the exception of one counselor who he did assault, in a parole context. So he is somebody, from the age of five, who has been involved in social -- substance abuse, and traumatic, excessive abuse upon him: Sexual abuse, physical abuse, upon his person. And then, he was placed, from that situation, into the Department of Corrections, CYA. And from there, he goes to the Department of Corrections at -- and in and out of the state hospitals and the Department of Corrections. Totally unable to function." Counsel asserted that defendant's conduct was the result of "his mental illness," which was the result of "things that were not volitional on his part, at all." Counsel concluded that while defendant's behavior was "very serious," it was "not the type of recidivist behavior that the Three Strikes Law was meant to -- correct and punish."

Defendant also addressed the court. He explained that on "the day all this happened, [he] was actually in the middle of changing from one type of med to another." He continued: "I know I have a mental illness, and before I came to county jail, I was in state hospital, and they -- I learned a lot more in state hospital than I ever did in prison.

4

I've been in prison more than state hospital, so I'm just asking for a chance to get some help and better my life." He also reiterated that he had "antisocial personality disorder" and that he "was sexually abused" as a child. He also described how he had started "smoking weed . . . at five years old" and first tried "meth at eight, for the first time on [his] eighth birthday."

The prosecutor opposed defendant's request that the prior strike be stricken. He acknowledged that defendant "was presented with some pretty tough situations growing up." But, the prosecutor noted, defendant had "committed multiple assaults, and I think for the safety of [the] public, and so that, perhaps, [defendant] can accept the gravity of what happened on that day, that the Court [should] not strike the strike . . . ." Considering defendant's circumstances, the prosecutor believed that a low or midterm sentence, doubled, would be appropriate.

The court refused to strike the strike. The court imposed a six-year prison term, double the midterm for the battery offense.

### III. Discussion

### A. Prior Strike

Defendant contends that the trial court abused its discretion by declining to strike his prior strike. He argues that he suffers from mental illness, the instant battery offense and his past offenses resulted from his mental illness, and the intent of the "Three Strikes" law was not to incapacitate or punish people with mental illness. Defendant also contends that the circumstances of his background supported striking the strike.

Section 1385 permits a trial court to "strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, 'in furtherance of justice'. . . . " (*People v. Williams* (1998) 17 Cal.4th 148, 158 (*Williams*); *People v. Carmony* (2004) 33 Cal.4th

367, 373 (*Carmony*).) "[T]he court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*Carmony*, *supra*, 33 Cal.4th at p. 375.) The party attacking the sentence bears the burden "'"to clearly show that the sentencing decision was irrational or arbitrary."'" (*Id.* at p. 376.) Reversal is not required "'"merely because reasonable people might disagree."'" (*Id.* at p. 377.) "Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Ibid.*)

In this case, defendant was convicted of battery on a nonprisoner by a prisoner, his fourth conviction for such an offense. Defendant attempts to assert that the instant offense was "relatively minor . . . ." We disagree. Far from minor, after defendant struck the prison officer with liquid fecal matter, defendant declared that he "got him" and suggested the officer was in danger of contracting Hepatitis C. Regarding his prior offenses, after serving his sentences for the 2004 battery offenses, defendant very quickly reoffended by attempting to commit a burglary and was returned to custody. Thereafter, he committed and was convicted of resisting a peace officer, vandalizing property, and felony assault. The character and nature of defendant's current and prior offenses were distinctly violent, and even assuming some part of defendant's conduct was attributable to mental illness, he nevertheless was found criminally culpable in each case.

Defendant undoubtedly has a long history of criminal conduct, drug addiction, and mental illness. However, it was not unreasonable for the court to conclude that defendant

6

was a recidivist who fell within the spirit of the Three Strikes law. Although many of defendant's offenses occurred inside the prison system, the court could still reasonably conclude that he exhibited a persistent inability to conform his conduct to the bounds of the law. The bulk of defendant's arguments on appeal were made in the trial court, and thus considered by the trial court and rejected. The trial court was not required to place greater weight on mental illness than on other relevant factors, and the record reflects that the court gave due consideration to defendant's arguments. We cannot substitute our judgment for that of the trial court. Because the trial court's determination was not "so irrational or arbitrary that no reasonable person could agree with it" (*Carmony*, *supra*, 33 Cal.4th at p. 377), we find no abuse of discretion.

Defendant also contends that the denial of his request to strike the prior strike violated his constitutional rights. He asserts that the trial court's improper denial of his request implicates his federal and state due process and equal protection rights. He also argues that his enhanced sentence amounts to cruel and unusual punishment.

Defendant's equal protection and due process claim is unavailing. He asserts that the "'"failure of a state to abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."' [Citation.]" This is not what happened in this case. Here, the record shows that the trial court considered, pursuant to section 1385, whether to exercise its discretion to strike defendant's prior strike. That the court ultimately declined to do so after weighing all the relevant factors *is consistent with* the statutory command of section 1385. Because the court properly exercised its authority and did not abuse its discretion, defendant's claim that the court's improper application of section 1385 violated his due process and equal protection rights necessarily fails.

We also reject defendant's claim that his six-year prison sentence amounts to cruel and unusual punishment. Relying almost entirely on *Gregg v. Georgia* (1976) 428 U.S.

7

153, 183, defendant contends that because his sentence is without penological justification, it represents a "'gratuitous infliction of suffering.'" The sentence in this case, however, was not without penological justification. Defendant had an extensive criminal history involving violence towards others and recidivism, and his current offense was violent. Accordingly, defendant's sentence was not a gratuitous infliction of suffering and thus was not cruel and unusual punishment.

## B. Section 1001.36

Defendant contends that his case should be remanded to determine his eligibility for mental health diversion under section 1001.36, which was enacted after he was sentenced. The Attorney General argues that defendant is precluded from seeking pretrial mental health diversion because the statute is not retroactive and because defendant has not shown eligibility for mental health diversion under section 1001.36.

### 1. Background

Effective June 27, 2018, the Legislature added two new sections to the Penal Code (§§ 1001.35, 1001.36) that authorize trial courts to grant "pretrial diversion" to defendants diagnosed with qualifying mental disorders.[4] (Stats. 2018, ch. 34, § 24.) Section 1001.36 permits a trial court to "grant pretrial diversion to a defendant pursuant to this section if the defendant meets all of the requirements specified in paragraph (1) of subdivision (b)." (§ 1001.36, subd. (a).) "As used in this chapter, 'pretrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point

---

[4] Effective January 1, 2019, the statute was amended to prohibit its use in cases involving murder, voluntary manslaughter, rape and other sex crimes, the use of a weapon of mass destruction, and any offense "for which a person, if convicted, would be required to register pursuant to Section 290, except for a violation of Section 314." (Stats. 2018, ch. 1005, § 1.)

8

in the judicial process from the point at which the accused is charged until adjudication . . . ." (§ 1001.36, subd. (c).)[5]

Section 1001.36 sets forth six requirements that must be satisfied for a defendant to be eligible for mental health diversion. First, the trial court must be "satisfied that the defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia." (§ 1001.36, subd. (b)(1)(A).) Second, the trial court must be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) Third, "a qualified mental health expert" must opine that "defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) Fourth, subject to certain exceptions related to incompetence, the defendant must consent to diversion and waive his or her right to a speedy trial. (§ 1001.36, subd. (b)(1)(D).) Fifth, the defendant must agree to "comply with treatment as a condition of diversion." (§ 1001.36, subd. (b)(1)(E).) Finally, the court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (b)(1)(F).)

If a defendant meets the eligibility requirements of section 1001.36, the trial court may order pretrial diversion into an approved treatment program. (§ 1001.36, subds. (c)(1)(A)-(B).) "The period during which criminal proceedings against the defendant may be diverted shall be no longer than two years." (§ 1001.36, subd. (c)(1)(3).) "If the defendant has performed satisfactorily in diversion, at the end of

---

[5]      On our own motion, we take judicial notice of the legislative history of Assembly Bill No. 1810 and Senate Bill No. 215. (Evid. Code, § 452, subd. (c).)

9

the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (§ 1001.36, subd. (e).) In addition, access to the "record of the arrest" shall be restricted, subject to specified limitations. (§ 1001.36, subd. (e).)

The Legislature expressly stated that the purpose of the mental health diversion law was "to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35.)

### 2. Legal Framework

The critical issue before us is whether section 1001.36 is retroactive. "It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287; § 3 ["No part of [the Penal Code] is retroactive, unless expressly so declared."].) However, in *In re Estrada* (1965) 63 Cal.2d 740, 744-745, 748 (*Estrada*), the California Supreme Court held that the presumption against retroactivity does not apply when the Legislature reduces the punishment for criminal conduct. Thus, under *Estrada*, we presume that the Legislature intended for a statutory amendment reducing criminal punishment to apply retroactively in cases that are not final on appeal. (*Ibid.*)

"The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law

10

to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.'" (*People v. Buycks* (2018) 5 Cal.5th 857, 881-882 (*Buycks*).) In other words, "the *Estrada* rule reflects a presumption about legislative intent," and "the Legislature . . . may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if it so chooses." (*People v. Conley* (2016) 63 Cal.4th 646, 656 (*Conley*).) The mere absence of an express statement concerning retroactivity "'does not end "our quest for legislative intent."'" (*Ibid*.) This is because case law "do[es] not 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an ameliorative change; rather, they require 'that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'" (*Id*. at pp. 656-657.)

In *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308 (*Lara*), the *Estrada* "inference of retroactivity" was held to apply to a statutory amendment that "ameliorated the possible punishment for a class of persons, namely juveniles." (*Id*. at p. 308.) In *Lara*, the statutory amendment at issue was the Public Safety and Rehabilitation Act of 2016 (Proposition 57). Proposition 57 changed the law to require the prosecution to initiate an action against a juvenile in juvenile court before a juvenile's case could be transferred to an adult criminal court. (*Lara*, at p. 303.) In *Lara*, the question presented was "whether [the] requirement of a transfer hearing before a juvenile can be tried as an adult applie[d] to [the] defendant even though he had already been charged in adult court before Proposition 57 took effect." (*Id*. at p. 306)

The *Lara* court concluded that *Estrada*'s rationale applied: "The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment." (*Lara*, *supra*, 4 Cal.5th at p. 303.) Because Proposition 57 "reduce[d] the

11

possible punishment for a class of persons" and "nothing in Proposition 57's text or ballot materials rebut[ted]" the *Estrada* inference of retroactivity, the California Supreme Court "conclude[d that] this part of Proposition 57 applie[d] to all juveniles charged directly in adult court whose judgment was not final at the time it was enacted." (*Id.* at p. 304.)

### 3. Analysis

There is uniform agreement that section 1001.36 "confers a potentially ameliorative benefit to a specified class of persons." (*People v. Craine* (2019) 35 Cal.App.5th 744, 754, review granted Sept. 11, 2019, S256671 (*Craine*); *People v. Frahs* (2018) 27 Cal.App.5th 784, 791, review granted Dec. 27, 2018, S252220 (*Frahs*); *People v. Weaver* (2019) 36 Cal.App.5th 1103, 1117, review granted Oct. 9, 2019, S257049 (*Weaver*).) We agree that the statute is an ameliorative change in the criminal law because it potentially reduces punishment for a class of persons. Accordingly, to determine if section 1001.36 may be applied retroactively, we must determine if " 'the Legislature demonstrate[d] its intention' " to overcome the *Estrada* presumption " 'with sufficient clarity that a reviewing court can discern and effectuate it.' " (*Conley*, *supra*, 63 Cal.4th at p. 657.)

Our review of the text, purposes, and operation of section 1001.36 reveals that the Legislature has demonstrated with sufficient clarity that it did not intend for section 1001.36 to apply retroactively to cases that have progressed beyond adjudication but are not yet final. " ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]" [Citation.]' " (*People v. Scott* (2014) 58 Cal.4th 1415, 1421.)

Section 1001.36 defines " 'pretrial diversion' " as the "*postponement of prosecution*, either temporarily or permanently, at any point in the judicial process *from*

12

*the point at which the accused is charged until adjudication*, to allow the defendant to undergo mental health treatment" subject to the court's supervision. (§ 1001.36, subd. (c), italics added.) By plainly identifying the statute as a *pretrial* diversion program, the Legislature clearly expressed its intent that the statute not be applied after a person has been convicted. The Legislature's express statement that the statute would apply only "until adjudication" precludes a construction of the statute that would apply it after "the rendition or pronouncement of judgment, which occurs at the time of sentencing." (*Craine*, *supra*, 35 Cal.App.5th at p. 755, italics omitted.)

We "must assume . . . that the Legislature's choice of words was not an idle act." (*County of Alameda v. Workers' Comp. Appeals Bd.* (2013) 213 Cal.App.4th 278, 284-285.) Had the Legislature intended for section 1001.36's mental health diversion provisions to apply to *posttrial* defendants, after adjudication, the Legislature would have said so. (*Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507, 529.) It did not. Rather, the clear statutory text is plainly inconsistent with an intent that the statute operate retroactively after adjudication. The statutory language clearly reflects the Legislature's intent that the pretrial diversion program operate only prospectively, that is, "from the point at which the accused is charged until adjudication . . . ." (§ 1001.36, subd. (c).)

The statute's eligibility requirements also expressly reflect the Legislature's intent that the statute be applied only prior to adjudication. For instance, the statute requires the defendant to consent to diversion and "waive[] the defendant's right to a speedy trial . . . ." (§ 1001.36, subd. (b)(1)(D).) However, there is no longer a right to a speedy trial to waive after a defendant has been convicted and sentenced. (*Betterman v. Montana* (2016) __ U.S. __ [136 S.Ct. 1609, 1618]; *People v. Domenzain* (1984) 161 Cal.App.3d 619, 622.) Retroactive application of the statute would render this provision impossible to satisfy, which would be inconsistent with section 1001.36's command that

a court may not grant pretrial diversion unless "the defendant meets *all* of the requirements specified in paragraph (1) of subdivision (b)." (§ 1001.36, subd. (a), italics added.)

Section 1001.36's other requirements are also expressly inconsistent with retroactive application. The statute lists certain circumstances under which the court "shall . . . hold a hearing to determine whether the criminal proceedings should be reinstated, whether treatment should be modified, or whether the defendant should be" subject to conservatorship proceedings. (§ 1001.36, subd. (d)(1)-(4).) These provisions, which provide for what to do if a defendant who is initially granted diversion is later found to be no longer suitable for pretrial diversion, are capable of application only in a situation where the defendant's case has *not* been adjudicated. To apply section 1001.36 retroactively to cases that have been adjudicated would require the court to rewrite the statute to provide for the dismissal or reinstatement of a conviction and sentence, as circumstances warrant. "This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed. This court is limited to interpreting the statute, and such interpretation must be based on the language used." (*Seaboard Acceptance Corp. v. Shay* (1931) 214 Cal. 361, 365.)

In *Frahs*, the Fourth District Court of Appeal found section 1001.36 to be retroactive, but we find the reasoning in *Frahs* to be unpersuasive. The Fourth District acknowledged the obvious incongruity between the plain statutory language limiting pretrial diversion to the period prior to adjudication and the potential retroactive application of the statute to cases after adjudication. However, it discounted this incongruity by reasoning that "[t]he fact that mental health diversion is available only up until the time a defendant's case is 'adjudicated' is simply how this particular diversion program is ordinarily designed to operate." (*Frahs*, *supra*, 27 Cal.App.5th at p. 791.) We do not find this reasoning persuasive. Section 1001.36 describes the one and only

*way* in which the Legislature designed this *pretrial* diversion program to operate. To apply the statute under circumstances that do not fall within the statute's requirements would require this court to rewrite the statute or engage in extrastatutory judicial construction. "When the language of a statute . . . is clear and unambiguous, judicial construction is not necessary and the court should not engage in it." (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 323.) Here, the Legislature clearly expressed the limits of the statute, and we lack the power to rewrite the statute to expand its reach.

In *Weaver*, a panel of this court also concluded that section 1001.36 is retroactive. That panel took the position "that the burden to overcome the *Estrada* inference is substantial." (*Weaver*, *supra*, 36 Cal.App.5th at p. 1117.) It concluded that to overcome the *Estrada* presumption, the statute needed to include either an express savings clause or "an alternative mechanism, such as a petition requirement," that clearly demonstrated legislative intent on the question of retroactivity. (*Weaver*, at p. 1119.) Notwithstanding the prospective structure and apparent limiting language in the statute, the panel concluded that there was "nothing in the text of section 1001.36 sufficient to overcome the *Estrada* presumption." (*Id.* at p. 1120.) It noted that "the Legislature did not include in section 1001.36 an 'express savings clause' mandating prospective application." (*Ibid.*)

The California Supreme Court has made clear that "the absence of an express savings clause does not necessarily resolve the question whether a lawmaking body intended a statute reducing punishment to apply retrospectively." (*People v. DeHoyos* (2018) 4 Cal.5th 594, 601.) "Rather, what *is* required is that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it." (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1049.) In this context, the *Estrada* presumption is a "*limited* rule of retroactivity that applies to newly enacted criminal statutes intended to reduce punishment for a class of offenders." (*Buycks*, *supra*, 5 Cal. 5th at p. 881, italics

15

added.)  Section 1001.36's express language and structure is sufficiently clear to demonstrate the Legislature's intent that the statute operate only prospectively, and it therefore overcomes *Estrada*'s limited presumption of retroactivity.  The obvious incongruity between the language and structure of the statute on the one hand and retroactive application on the other clearly demonstrates that the Legislature did not intend for section 1001.36 to apply retroactively to cases that have progressed beyond adjudication of guilt to sentencing.  A more explicit statement on retroactivity was not required.

We find additional support in the legislative history for our holding that section 1001.36 was not intended to be applied retroactively.  The Legislature described the original diversion program as the "Incompetent to Stand Trial Mental Health Diversion Program," which was aimed at implementing "a mental health diversion program with a focus on reducing the number of Incompetent to Stand Trial referrals to the Department of State Hospitals."  (Assem. Floor, Bill Analysis of Assem. Bill No. 1810 (2017-2018 Reg. Sess.) as amended June 12, 2018, p. 7; see also, Sen. Rules Com., Off. of Sen. Floor Analyses, Bill Analysis of Assem. Bill No. 1810 (2017-2018 Reg. Sess.) as amended June 12, 2018, p. 3.)  It is inconceivable that a program aimed at reducing pretrial referrals to state hospitals would be intended to apply *after* trial, adjudication, and sentencing.  Indeed, incompetency proceedings are only applicable before a defendant has been convicted and sentenced.  (E.g., § 1368, subd. (a) ["If, *during the pendency of an action and prior to judgment*, or *during revocation proceedings* for a violation of probation, mandatory supervision, postrelease community supervision, or parole, a doubt arises in the mind of the judge as to the mental competence of the defendant . . . ." (Italics added.).]

When section 1001.36 was amended by Senate Bill No. 215, the legislative analysis noted that the bill's author had stated that the bill sought "to reduce recidivism

16

rates for mentally ill defendants, and to avoid unnecessary and unproductive costs of trial and incarceration." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, p. 3.) The author also noted the high costs of jailing a mentally ill defendant. "The predictable results of California's reliance on this outdated method are higher costs for taxpayers, who are forced to pay for the continuous warehousing of the mentally ill, when early, court-assisted interventions are far more likely to lead to longer, cheaper, more stable solutions for the community, and for the person suffering from mental illness." (*Id.* at pp. 2-3.)

This legislative focus on pretrial "early . . . interventions" demonstrates that section 1001.36 was intended to divert eligible defendants at an early stage of the criminal proceedings to avoid the costs of referrals to state hospitals, pretrial incarceration, and trials, and to provide eligible defendants the benefit of *early* intervention. By the time a defendant has already been tried, convicted, and sentenced, there is no longer any opportunity for early intervention. The instant case illustrates why the Legislature's intent in enacting section 1001.36 is inconsistent with retroactive application of the statute. Here, defendant was sentenced on September 20, 2017, and he was awarded a total of 868 days of presentence custody credit against his six-year prison term. If section 1001.36 applied retroactively, defendant would have served the bulk of his sentence before his case could be remanded for consideration of *pretrial* diversion.[6]

We conclude that the structure, language, and legislative history of section 1001.36 establish that it was not intended to apply retroactively to cases that have been adjudicated but are not yet final on appeal. We respectfully disagree with the dissent's

---

[6]     The time interval in this case between defendant's sentencing and consideration of his appeal is not unusual. As the *Craine* court observed, based on recent statistics, "[n]inety percent of criminal appeals are processed within an average of 834 days." (*Craine*, *supra*, 35 Cal.App.5th at p. 759.)

17

reliance on *Lara*. In *Lara*, Proposition 57 was held to apply retroactively because it "reduce[d] the possible punishment for a class of persons," which permitted the inference of retrospective operation, *and* because "nothing in Proposition 57's text or ballot materials rebut[ted] this inference." (*Lara*, *supra*, 4 Cal.5th at pp. 303-304.) In this case, in contrast with Proposition 57, section 1001.36's structure, language, and legislative history clearly rebut the *Estrada* inference. Thus, *Lara* does not dictate the result urged by the dissent.

Our holding is consistent with the holding of the majority of another panel of this court in *People v. Khan* (2019) 41 Cal.App.5th 460, review granted January 29, 2020, S259498 (*Khan*). In *Khan*, the majority held that the "text, structure, and purposes of the pretrial diversion law" clearly demonstrated that "the Legislature did not intend the law to be applied postadjudication to defendants who have already been properly tried and found guilty, and are serving their sentences."[7] (*Id.* at pp. 493-494.)

## IV. Disposition

The judgment is affirmed.

---

[7]     Like the majority in *Khan*, we do not opine as to whether the pretrial diversion law "was meant to apply to defendants whose alleged offenses were committed *before* the law's effective date but whose cases are still at the preadjudication stage," nor do we "resolve whether the pretrial diversion law was meant to apply to defendants whose alleged offenses were committed before the law's effective date, whose convictions are overturned on appeal, and who may be subjected to a full retrial." (*Khan*, *supra*, 41 Cal.App.5th at p. 494, fn. 7.)

_____
Mihara, J.

I CONCUR:


_____
Elia, Acting P.J.

People v. Lipsett
H045282

BAMATTRE-MANOUKIAN, J., Concurring and dissenting.

I respectfully dissent from my colleagues' determination that newly enacted Penal Code section 1001.36,[1] which created a pretrial diversion program for certain offenders with diagnosed mental disorders, does not apply retroactively to all cases not yet final on appeal.

Much has been written on this issue. Courts including this one are divided regarding whether section 1001.36 applies retroactively. (Compare, e.g., *People v. Khan* (2019) 41 Cal.App.5th 460, review granted Jan. 29, 2020, S259498 and *People v. Craine* (2019) 35 Cal.App.5th 744, review granted Sept. 11, 2019, S256671, with *People v. Weaver* (2019) 36 Cal.App.5th 1103, review granted Oct. 9, 2019, S257049 (*Weaver*), and *People v. Frahs* (2018) 27 Cal.App.5th 784, review granted Dec. 27, 2018, S252220 (*Frahs*).) The majority opinion in this case is scholarly and well-reasoned. However, for the reasons I state below, based on the California Supreme Court's recent guidance in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*), I am compelled to conclude that section 1001.36 applies retroactively to all nonfinal judgments. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

When the Legislature lessens or ameliorates punishment, we must infer that it intended the new legislation to "apply to every case to which it constitutionally could apply," including "to acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final." (*In re Estrada* (1965) 63 Cal.2d 740, 745 (*Estrada*).) This rule "rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention *concerning any retroactive effect*, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

sentences that are final and sentences that are not.' [Citation.]" (*People v. Buycks* (2018) 5 Cal.5th 857, 881-882, italics added.)

There is no dispute that section 1001.36 is an ameliorative statute. My colleagues determine from the law's "text, purposes, and operation . . . that the Legislature has demonstrated with sufficient clarity that it did not intend for section 1001.36 to apply retroactively to cases that have progressed beyond adjudication but are not yet final." (Maj. opn. *ante*, p. 12.) Based on my reading of *Lara*, I am not persuaded that the Legislature's intent in enacting section 1001.36 is sufficiently clear to rebut the *Estrada* inference. (See *Weaver*, *supra*, 36 Cal.App.5th 1103.)

In *Lara*, the court held that Proposition 57, which amended Welfare and Institutions Code sections 602 and 707 to eliminate prosecutors' ability to charge juvenile offenders directly in adult court, applied retroactively to all minors charged directly in adult court whose judgments were not final, including those already charged, tried, and convicted as adults. (*Lara*, *supra*, 4 Cal.5th at pp. 303-304.) Despite the legislation's requirement that prosecutors bring motions to transfer minors from juvenile court to adult court "prior to the attachment of jeopardy" (Welf. & Inst. Code, § 707, subd. (a)(1), (2)), the court determined that "[n]othing in Proposition 57 itself or the ballot materials rebuts [*Estrada*'s] inference" of retroactivity (*Lara*, *supra*, at p. 309). The court concluded that although "the appropriate remedy" for juveniles already convicted as adults could be "somewhat complex," that was "no reason" to deny those offenders transfer hearings. (*Id.* at p. 313.)

Based on *Lara*, I do not agree with my colleagues' conclusion that the Legislature, through its use of the term "pretrial diversion" and its definition of " 'pretrial diversion' " as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication" (§ 1001.36; *id*., subd. (c)), clearly indicated its intent that the statute apply only prospectively. (See maj. opn. *ante*, pp. 12-13.) Rather, I agree with the determination in

2

*Frahs* that "[t]he fact that mental health diversion is available only up until the time that a defendant's case is 'adjudicated' is simply how this particular diversion program is ordinarily designed to operate. Indeed, the fact that a juvenile transfer hearing under Proposition 57 ordinarily occurs prior to the attachment of jeopardy, did not prevent the Supreme Court in *Lara* . . . from finding that such a hearing must be made available to all defendants whose convictions are not yet final on appeal." (*Frahs*, *supra*, 27 Cal.App.5th at p. 791; cf. *People v. Francis* (1969) 71 Cal.2d 66, 75, 77-78 [concluding that a statutory amendment vesting discretionary sentencing power in the trial court applied retroactively to all cases not final on appeal, including those where the defendant had already been sentenced, despite " 'the very nature' of the [sentencing] amendment"].)

My colleagues determine that section 1001.36's requirement that a defendant waive his or her right to a speedy trial (§ 1001.36, subd. (b)(1)(D)) and its mandate that the trial court "hold a hearing to determine whether the criminal proceedings should be reinstated, whether the treatment should be modified, or whether the defendant should be . . . referred [for] conservatorship proceedings" if circumstances arise indicating the defendant's unsuitability for continued placement in the diversion program (§ 1001.36, subd. (d)) are "expressly inconsistent with retroactive application" (Maj. opn. *ante*, p. 14). The same holds true, however, regarding the provisions in Proposition 57 that require a transfer motion to be filed prior to the attachment of jeopardy and mandate the juvenile court to "postpone the taking of a plea to the petition until the conclusion of the transfer hearing." (Welf. & Inst. Code, § 707, subd. (a)(3); see *id*., subd. (a)(1)-(3).) Despite those requirements, which are also inconsistent with retroactive application, the Supreme Court found "[n]othing in Proposition 57" to rebut *Estrada*'s inference of retroactivity. (*Lara*, *supra*, 4 Cal.5th at p. 309.)

The majority also points to the fact that the retroactive application of section 1001.36 "to cases that have been adjudicated would require the court to rewrite the statute to provide for the dismissal or reinstatement of a conviction and sentence, as

3

circumstances warrant." (Maj. opn. *ante*, p. 14.) But the Supreme Court in *Lara* cited with approval the judicially crafted remedies fashioned by two Courts of Appeal for minors who had already been convicted in adult court before the passage of Proposition 57 but whose cases were not final on appeal. (*Lara*, *supra*, 4 Cal.5th at pp. 312-313.)

In *People v. Vela* (2018) 21 Cal.App.5th 1099, 1113, for example, the Court of Appeal conditionally reversed the judgment and remanded the matter to the juvenile court for it to conduct a transfer hearing. The court ordered the juvenile court "[w]hen conducting the transfer hearing . . . to . . . treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer [the defendant's] cause to a court of criminal jurisdiction. [Citation.] If, after conducting the juvenile transfer hearing, the court determines that it would have transferred [the defendant] to a court of criminal jurisdiction because he is 'not a fit and proper subject to be dealt with under the juvenile court law,' then [the defendant's] convictions are to be reinstated. [Citation.] . . . On the other hand, if the juvenile court finds that it would *not* have transferred [the defendant] to a court of criminal jurisdiction, then it shall treat [the defendant's] convictions as juvenile adjudications and impose an appropriate 'disposition' within its discretion." (*Ibid.*) Proposition 57 did not contain this remedy; it was crafted by the Court of Appeal.

Finally, my colleagues reference section 1001.36's legislative history demonstrating the Legislature's focus on " 'early . . . interventions' " in order to reduce the costs incurred from competency referrals to state hospitals and " 'the continuous warehousing of the mentally ill.' " (Maj. opn. *ante*, p. 17.) Because " 'early . . . intervention[]' " is impossible in cases such as this where the defendant has already been convicted, my colleagues conclude that "the Legislature's intent in enacting section 1001.36 is inconsistent with retroactive application of the statute." (Maj. opn. *ante*, p. 17.)

4

However, section 1001.35 "provides an express statutory statement of [the] legislative intent" behind the enactment of section 1001.36. (*People v. Burns* (2019) 38 Cal.App.5th 776, 788 (*Burns*).) Section 1001.35 states that the "purpose" of mental health diversion "is to promote": (1) "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety"; (2) "[a]llowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings"; and (3) "[p]roviding diversion that meets the unique mental health treatment and support needs of individuals with mental disorders."

Notably, cost savings are absent from the Legislature's stated purpose of mental health diversion, "and the first and third objectives would be promoted by retroactive application. A similar legislative purpose, to stop the revolving door of criminal justice for juveniles, was found in *Lara* to 'support the conclusion that *Estrada*'s inference of retroactivity is not rebutted.' (*Lara*, *supra*, 4 Cal.5th at p. 309.)" (*Burns*, *supra*, 38 Cal.App.5th at p. 788.) With respect to the legislative history quoted by the majority, the retroactive application of section 1001.36 to a qualified offender who has already been convicted would appear to advance the goal of halting " 'the continuous warehousing of the mentally ill' " through " 'court-assisted interventions . . . more likely to lead to longer, cheaper, more stable solutions for the community and for the person suffering from mental illness' " (Maj. opn. *ante*, p. 17)—even if the interventions come at a much later stage than will be the case through the prospective application of the statute.

For the reasons stated above, I conclude, based on the California Supreme Court's guidance in *Lara*, that section 1001.36 applies retroactively to cases not yet final on appeal because there is no sufficiently clear indication of the Legislature's intent to limit the statute's " 'ameliorating benefit,' " rather than extending it " 'as broadly as

5

possible.' " (*Lara*, *supra*, 4 Cal.5th at p. 308.)  I respectfully invite the California Supreme Court to provide guidance at its earliest convenience regarding whether section 1001.36 applies retroactively to all cases not yet final on appeal.

_____
BAMATTRE-MANOUKIAN, J.

*People v. Lipsett*
**H045282**

| | |
|---|---|
| Trial Court: | Monterey County Superior Court |
| Trial Judge: | Honorable Lydia Villarreal |
| Attorney for Defendant and Appellant: | James S. Thomson<br>Under Appointment by the Sixth District<br>Appellate Program |
| Attorney for Plaintiff and Respondent: | Xavier Becerra<br>Attorney General of California<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Catherine A. Rivlin<br>Supervising Deputy Attorney General<br><br>Basil R. Williams<br>Deputy Attorney General |

People v. Lipsett
H045282